**James DORSEY, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CF–1099.

District of Columbia Court of Appeals.

Argued En Banc June 22, 2011.

Decided Jan. 3, 2013.

Samia Fam, Public Defender Service, with whom James Klein and Mikel–Meredith Weidman, Public Defender Service, were on the brief, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Mary B. McCord and Jonathan W. Haray, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, GLICKMAN, BLACKBURNE–RIGSBY, THOMPSON, and OBERLY, Associate Judges, and REID * and RUIZ,** Senior Judges.

GLICKMAN, Associate Judge:

Appellant James Dorsey was convicted after a jury trial of assaulting and robbing an elderly street vendor.[1] The videotape of Dorsey's confession, introduced at his trial by the prosecution in its case-in-chief, was the most compelling evidence against him. In this appeal, Dorsey contends the trial court erred in admitting the confession.

While he was in police custody, Dorsey endured a grueling overnight interrogation during which, as the government concedes, detectives violated the rules of *Miranda v. Arizona*[2] and *Edwards v. Arizona*[3] by continuing to press him to confess after he

---

* Judge Reid was an Associate Judge, Retired, at the time of argument. Her status changed to Senior Judge on December 12, 2011.

** Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

1. Dorsey was found guilty of aggravated assault while armed (shod foot), in violation of D.C.Code §§ 22–404.01, –4502 (2001), and armed robbery of a senior citizen, in violation of D.C.Code §§ 22–2801, –4502, –3601 (2001).

2. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

invoked his Fifth Amendment rights—both his right to cut off further questioning and remain silent, and his right to have counsel present during his questioning. As of 8:30 in the morning, when the detectives returned Dorsey to his holding cell, he still had not incriminated himself. Approximately seven hours later, however, Dorsey called out from his cell and asked for a second meeting with the detectives, saying he wanted to confess. He proceeded to do so without explicitly waiving his constitutional rights.

Prior to trial, Dorsey moved to suppress his confession. His motion was denied. The motions judge concluded that, notwithstanding the *Miranda* and *Edwards* violations, Dorsey validly initiated his second meeting with the detectives and waived his rights. The judge found that Dorsey was motivated to confess by feelings of remorse.

In a two-to-one decision, a division of this court upheld the admission of Dorsey's confession and affirmed his convictions.[4] The division majority agreed with the government that Dorsey's confession was obtained in compliance with the dictates of *Miranda* and *Edwards*. The dissent disagreed, arguing that Dorsey's initiation and waiver were invalid because he had been badgered into giving up his rights.

On March 25, 2011, in recognition of the important and difficult questions posed in this case, the full court granted Dorsey's petition for rehearing en banc and vacated the division's opinion and judgment. We are called on in this appeal to apply the rule announced in *Edwards* that a suspect in police custody who has invoked his Fifth Amendment right to counsel may not be interrogated further unless the suspect initiates the conversation with the police and

waives his *Miranda* rights knowingly, intelligently, and voluntarily. To do so, we must clarify the requirements for finding a valid initiation and waiver and decide whether those requirements were satisfied here despite the *Miranda* and *Edwards* violations in the interrogation that preceded Dorsey's confession.

As to the initiation, it was the government's burden to show that Dorsey's request to resume speaking with the police was not the product of the improper post-invocation badgering to which he had been subjected. Similarly, it was the government's burden to establish that Dorsey waived his Fifth Amendment rights knowingly, intelligently, and voluntarily even though the detectives had thwarted his repeated efforts to terminate his interrogation and have an attorney present. We conclude that the government failed to show that the initiation and waiver requirements of *Edwards* were satisfied in this case.

Accordingly, we reverse Dorsey's convictions and remand this case for a new trial.

## I. Factual Background

The charges against Dorsey arose out of the robbery of 83–year–old Vassiliki Fotopoulous, a street vendor in Foggy Bottom, on May 3, 2005. The robbery was caught on videotape by a surveillance camera. The tape, which was broadcast on local television stations, showed a man confronting Fotopoulous in the loading dock of her apartment building, knocking her down, kicking her while she was on the ground, searching her pockets, and then leaving the scene. The man's face was not clearly visible on the tape, but after viewing the broadcast, persons who knew Dorsey reported that they recognized him as Foto-

4. *Dorsey v. United States*, 2 A.3d 222 (D.C. 2010) (vacated).

poulous's assailant based on the man's gestures and clothing.[5]

Dorsey was arrested on the evening of May 7, 2005, on an unrelated domestic violence complaint. He attempted to flee when the police tried to apprehend him, and when he was stopped, he reportedly said, "[t]hat's me on TV."[6] Dorsey matched the physical description that Fotopoulous had provided of her attacker. He was brought to the Second District police station and placed in an interrogation room. There he remained, handcuffed to his chair except when he was allowed to use the bathroom, for the next thirteen hours. For much of that time, amounting to some nine to ten hours in all, Dorsey was left alone in the room, but at intervals throughout the night and into the early morning, four investigators—lead Detective Michael Ross and Detectives Joseph Crespo, Keith Tabron, and Robert Thompson—took turns interrogating him. They continued to do so despite Dorsey's calls for a halt to the questioning and his requests for a lawyer. Finally, the next morning, they moved Dorsey, who still had not incriminated himself, to a holding cell, where he was allowed to rest pending the anticipated resumption of his interrogation on Sunday afternoon. Approximately seven hours later, before the detectives returned to question him again, Dorsey asked to talk to the police, saying he wanted to confess. He was brought back to the interrogation room. There he admitted to Crespo and a fifth investigator, Sergeant James Young, that he had robbed Ms. Fotopoulous.

Dorsey moved to suppress his confession as having been taken in violation of his Fifth Amendment rights. After a hearing before Judge Gardner, at which the detectives and Dorsey testified and the recordings of Dorsey's interrogations were introduced, his motion was denied. The government introduced the hour-long tape of Dorsey's confession in evidence against him at trial.

Given the nature of the legal issues before us, it is necessary to describe Dorsey's interrogations in considerable detail.[7]

## A. Inception of the Interrogation: Dorsey Waives His Rights and Is Questioned About His Girlfriend's Domestic Violence Complaint

Dorsey's interrogation commenced at about 7:30 p.m. on Saturday night. Detective Ross informed Dorsey that he was there to be questioned, "initially," about an incident involving his girlfriend, Diane Bush. Ross would not "go into it," he said, until after he had advised Dorsey of his rights and Dorsey had had something to eat. Ross inquired whether Dorsey was under the influence of drugs or alcohol. Dorsey responded that he had been drinking and said he last had consumed alcohol—two cans of beer—at around 10:00 a.m. that morning. Ross confirmed that Dorsey was not drunk and understood "everything we're talking about." Detective Crespo, whom Dorsey had known for "a long time," brought in some food from McDonald's. Ross and Crespo then left Dorsey alone so he could eat.

At 8:25 p.m., Ross returned with Detective Tabron. Ross introduced Tabron as

---

**5.** Dorsey was not the only suspect, however.

**6.** During his subsequent interrogation, Dorsey explained that he had been told about the broadcast but had not seen it himself and did not know why the police wanted to speak to him.

**7.** In accordance with the requirements of D.C.Code § 5–116.01 (2008 Repl.), which took effect only days before Dorsey was arrested, his interrogations were videotaped in their entirety.

the detective who would tell Dorsey why he was being charged after they advised him of his *Miranda* rights. Dorsey read through the standard PD–47 advice-of-rights card, commented that he was "used to" it,[8] and agreed to answer the detectives' questions without a lawyer present. Tabron then started asking Dorsey about his girlfriend. Dorsey said he did not want to talk about her, but Tabron explained that "the reason I'm here" was to investigate the report of an altercation between Dorsey and his girlfriend on May 3. Neither then nor for some time thereafter did the detectives mention the robbery of Ms. Fotopoulous.

■ Disregarding Dorsey's expressed wish not to talk about his girlfriend,[9] Tabron and Ross proceeded to ask him numerous questions relating to the domestic violence report. After a while, however, Ross started questioning Dorsey about where he was at the time of the Fotopoulous robbery on May 3 and the clothing he was wearing that day. Dorsey denied having been in Foggy Bottom or having camouflage pants or other clothing of the type worn by Fotopoulous's assailant. He stuck with those denials even when Ross told him he had witnesses who contradicted him, showed him a still photo from the surveillance video of the robbery,[10] and

said that DNA had been deposited at the location of "this assault down in Foggy Bottom."[11] Ross repeatedly accused Dorsey of lying. He observed that Dorsey was "sweating like a son of a gun"; Dorsey explained that it was because he was an alcoholic and had not had anything to drink since that morning.

At one point, Ross suggested that he could have someone take a sample of Dorsey's DNA to compare it with the "DNA that was left on the scene."[12] Dorsey responded that he would be willing to do that if he had a lawyer. Saying he might be able to get a lawyer for Dorsey, Ross, accompanied by Tabron, left the room. While they were out, Crespo came in and talked with Dorsey for a few minutes.

Dorsey, expressing frustration at what Ross and Tabron were "trying to do," asserted to Crespo that he had been telling the truth about not having been in the Foggy Bottom area. Crespo responded that when he and his partner saw "that video," they "thought it's got to be [Dorsey]." After recalling how he had given Dorsey breaks in the past (mainly by tolerating Dorsey's panhandling), Crespo said that "if there's somebody you're going to talk to, I hope it would be me." He and Dorsey had a "mutual respect," Crespo

8. Dorsey, who was 46 years old, had been arrested over thirty times before and had ten prior convictions. He had graduated from the twelfth grade and could read and write.

9. Judge Gardner subsequently ruled that the detectives violated Dorsey's Fifth Amendment rights by continuing to question him about his girlfriend after he unambiguously asserted his right to cut off questioning on that subject. The judge suppressed all statements that Dorsey made about his girlfriend in response to such questioning. Dorsey's selective unwillingness to be questioned about his girlfriend did not constitute an assertion of his right to terminate all questioning. *See Burno v. United States*, 953 A.2d 1095, 1101–02 (D.C.2008).

10. Dorsey denied that he was the man shown in the photo and said that it looked like someone he knew named "Bolly."

11. This vague allusion to an assault in Foggy Bottom was the first time in the interrogation that Ross referred to the robbery of Fotopoulous.

12. At trial, the government presented evidence that Dorsey was a potential minor contributor to DNA found on a white sock recovered from the scene of the robbery. The chance of a random match among African Americans for that DNA was said to be one in 3,300.

said, adding, "I honestly think you made a mistake. I honestly think that if you're going to try to feel better about what's probably going on in your head, if there's someone you're going to talk to, it should be me." Dorsey denied that he had anything to reveal. Crespo then asked Dorsey about his drinking. Dorsey said he "drinks every day.... I got to get a drink, because I get the shakings. I got the shakes in the morning, so I can't even eat, you know."

At this point, Detective Ross returned. Before leaving, Crespo assured Dorsey that Ross was "a good man," told him "there's things that you need to talk about," and again recounted how he "saw the video" and recognized Dorsey.

## B. Dorsey Tries to End the Interrogation

It was about 9:40 p.m. when Ross reentered the room. After confirming that Dorsey's request for a lawyer was limited to DNA testing and that he was not invoking his right to counsel during the interrogation,[13] Ross warned Dorsey to "get a tissue and get ready to wipe, because I'm getting ready to go at you hard." Over the next half hour or so, Ross pressed Dorsey to admit various potentially incriminating details, including his possession of a backpack, his use of a bicycle, a supposed injury to his hand, and his presence

in the Foggy Bottom area. Ross repeatedly accused Dorsey of lying. He briefly appealed to Dorsey's religious beliefs ("[Y]ou still have a soul and a heart, right?") and his feelings about his mother, comparing her to the woman in the photograph from the surveillance video ("You wouldn't want to see anything happen to your mother, would you? ... So don't you think that's somebody's mother?"). Ross also noted that Dorsey was "sweating again" and asked him why ("I'm cool as a cucumber, you sweating. Why you sweating?"). Ross laughed when Dorsey answered, "I need a drink.... I didn't get my drink today. Shit. I'm—shit, man, I'm shaking."

Around 10 p.m., Ross for the first time explicitly accused Dorsey of having robbed Ms. Fotopoulous in the Foggy Bottom area: "I'm going to tell you what you did. You robbed a[n] old woman. You followed her home, then you robbed her." Saying the robber's identity could be proved through DNA and fingerprint evidence,[14] Ross invited Dorsey to tell him his "version of what happened." Dorsey denied having robbed anyone and said, "Let's go to court.... I don't know what you talking about.... Take me back there [i.e., to the cellblock], and we'll go to court."

Ross continued to try to persuade Dorsey to confess to the robbery. Dorsey

---

**13.** "If you're saying you want a lawyer," Ross told Dorsey, "I'll stop right now, I'll walk out the door. *But we want to get to the bottom of this.* You're saying if—to take a DNA test, you want a lawyer, is that what you're saying?" In response, Dorsey agreed that he did not "need a lawyer" to talk to Ross. On appeal, Dorsey does not contend that he made an unequivocal invocation of his Fifth Amendment right to counsel at this point in the interrogation (as he did later in the interrogation). Nor does he argue that the statement we have italicized constituted a subtle, improper effort to chisel away at his possible resolve to invoke that right—though so it may

appear. *Cf. Davis v. United States,* 512 U.S. 452, 475, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (Souter, J., concurring) (noting that "clarifying" questions by police may "shade subtly into illicitly badgering a suspect who wants counsel").

**14.** Ross asked Dorsey if he had lost a pair of socks (which Dorsey denied) because "[t]he way you perspire, [DNA] could be very well in them socks." Ross also claimed the police had found "fingerprints on certain things that were touched," which was not true.

again asked to be returned to the "lockup," saying he was tired and wanted to "[g]o back there and go to sleep, man [and][g]o to court Monday." Ross asked if Dorsey was in a "rush" to get back to the lockup. Dorsey said, "Yeah," and Ross promised, "We'll be done in a little while." But Ross did not stop interrogating Dorsey. After leaving the room and returning a few minutes later, Ross told Dorsey that tissues he had been using to wipe the sweat from his forehead were "on their way to Quantico" for DNA analysis.[15] Dorsey continued to express his wish to "[j]ust go to court." Ross repeated that they needed to have "closure" and said "we're going to go to court one way or another. . . . The question is, how much time we want, a little or a lot?" Ross urged Dorsey to tell his side of the story and suggested that he was "out of control because of some drugs" and "did something stupid." Dorsey denied that. Ross warned him that "the wall's closing in" and it was "time for [Dorsey] to do the right thing." Ross asked Dorsey if he really wanted to go into a courtroom, face the evidence, and "roll the dice." Dorsey insisted that he did. Ross told him he "did a terrible job lying tonight" and recited some of the incriminating evidence. Dorsey continued to insist he was innocent and said, "You're playing with me. . . . [Y]ou'll find out when we go to court."

Several times during the interrogation, Ross left the room and returned with additional information contradicting Dorsey (e.g., "I found Randy and Randy said you do wear that kind of hat I was asking you about."). Ross told Dorsey he was "building a house" of evidence against him and that each time he left, he was getting "some more bricks." In response to one of those remarks, at approximately 11:10 p.m., Dorsey again asked to "go back [to the cellblock] to sleep. Take me back

now. . . . Take me back there and put me [indiscernible]." Judge Gardner later found that Dorsey unambiguously invoked his Fifth Amendment right to remain silent at this point.

## C. "Shaking Like a Leaf"

Telling Dorsey to "[l]ay back in the chair and relax" because he would have "a minute to sleep," Ross briefly left the interrogation room to obtain a paper jumpsuit for him. Upon returning, Ross discovered that Dorsey had urinated on himself. Ross took Dorsey's soiled clothes and gave him the jumpsuit. Saying it would be cold in the cellblock, Dorsey asked to keep his shirt, but Ross said he was seizing it as evidence "[b]ecause your perspiration's in it." Dorsey protested in vain—Ross told him, "You don't get the choice. I decide." When Dorsey still was slow to remove his shirt, Ross commented that "[t]hat DNA must've really scared you, man." Ross also took Dorsey's shoes. Although Ross promised to bring him paper shoes to wear instead, he did not do so despite Dorsey's repeated requests for them throughout the night.

After seizing Dorsey's clothing, Ross told him to wait while he went out to "build some bricks." Dorsey again asked to be taken back to the cellblock so he could sleep. Ross told him to lie down and sleep "on the ground" in the interrogation room, while Dorsey was still handcuffed to his chair, but Dorsey repeated that he wanted to go back to his cell. Ross observed that Dorsey was "shaking like a leaf." "I think you want to talk to me," Ross added. Dorsey denied it. Ross left the room and Dorsey, sitting there alone, began mumbling to himself ("Oh, my God. Bitch-ass dude, man. Shit, man. . . . Oh,

---

15. It appears this statement was untrue.

shit, man."). When Ross came back a few moments later, Dorsey once again asked to be returned to his cell so that he could sleep. Ross responded that the cellblock was "full right now," then said he would take Dorsey there "in a minute," and finally told Dorsey, "I'm not ready to take you back there yet." This exchange took place around midnight.

For the next two hours or so, Dorsey was left mostly alone in the interrogation room.[16] He spent some of that time lying on the floor, still handcuffed to his chair. During this period he was in evident distress, mumbling to himself from time to time. When another detective checked on him, Dorsey asked for a cigarette and remarked that Ross was "trying everything in the book." "I don't know what he trying now," Dorsey continued, "I don't know what's wrong with [Ross]." The detective responded that Dorsey was "messing up" and "mak[ing] the wrong decision" because "we got everything, man."[17]

### D. Detective Thompson Joins the Interrogation

At about 1:45 a.m., Ross returned with Detective Thompson. Ross told Dorsey there were "a couple more things we need to talk to you about," after which Dorsey could "get a little sleep." Thompson then took the lead, questioning Dorsey about matters already covered by Ross, including the identity of the robber shown on the videotape, whether Dorsey had altered his appearance following the robbery, whether he wore the same type of hat as the robber, his relations with his girlfriend, and other subjects. By this point, Dorsey was visibly fatigued and mumbling his answers. When Thompson pressed Dorsey about the lies he allegedly had told, Dorsey responded, "I didn't say that. . . . I don't want to talk about it." Thompson and Ross continued to interrogate Dorsey. Moments later, the following exchange took place:

BY DETECTIVE THOMPSON:

Q. Jimmy, when are you going to get behind these lies, man? When you going to start—

A. Take me back (indiscernible)—

Q. You know, I mean, what happened, I mean, it was bad, okay? It was bad, we all agree on it. But, you know, this whole thing is up here. We want to, we want to bring it down.

A. (Indiscernible) go to sleep now. Take me in the back, lock me up.

Q. I know you want to get this (indiscernible) off your chest. I know that.

DETECTIVE ROSS. It ain't going to go away, Jimmy.

BY DETECTIVE THOMPSON:

Q. Any decent person would want to get this off their chest, would you agree?

A. Huh?

Q. Any decent person would want to get this off their chest.

A. Let me do it when I go to court.

### E. "We'll Take a Run at This Tomorrow After You Get a Few Hours' Sleep"

After some additional questioning, and further unsuccessful requests by Dorsey to be allowed to "go to sleep," Ross said,

---

**16.** At one point, an officer entered to take photographs of Dorsey's hands. Later an officer brought him some water.

**17.** Given the distress and anxiety that Dorsey displayed (e.g., by soiling himself, "shaking like a leaf," and mumbling and cursing to himself), we are unable to share Judge Thompson's perceptions that Dorsey was at "ease . . . in the interrogation room" and that the only "aspect of the custodial interrogation that caused [him] discomfort" was "his inability to lie down to sleep." Post at 88, 90.

"Why don't we let you get a few hours' sleep? We'll take a run at this tomorrow after you get a few hours' sleep." Dorsey asked if he was being taken "downstairs." Ross said, "Yeah, I'll ask them to put you in a cell, is that okay? You want to do that? Because it ain't going to go away, Jimmy." Dorsey murmured ". . . cellblock now and just go lay down." Ross said, "Okay. I'm going to let you rest. It's 2:00 in the morning. I'm going to take a break and let you get some rest, okay?"

Next, however, Thompson and Ross asked Dorsey to let them examine his hands. As they did so, Thompson asked Dorsey whether he had ever broken his hand, and Ross commented that "[y]ou can see it in the videotape." Ross said he was "[t]rying to help you, Jimmy." He and Thompson then agreed that it was "time for [Dorsey] to get some rest." At approximately 2:10 a.m., the two detectives left the room.

### F. Detective Thompson Tells Dorsey How to "Minimize This Shit"

As he waited alone for someone to escort him to the cellblock, Dorsey again began mumbling and cursing to himself. In about twenty minutes, he called out and asked if he could make a phone call to Diane (his girlfriend). This request was denied.

Moments later, Detective Thompson reentered the room. Instead of taking Dorsey to his cell, Thompson commenced another round of questioning. Dorsey said that he was "tired as shit, man," and Thompson brought him some coffee. Thompson then began by asking Dorsey if he wanted to call his mother to wish her a happy Mother's Day. Next, Thompson told Dorsey that he was going to find Diane

and arrest her because she was "a wanted person." Dorsey said Thompson could not cross into another district to get her; disagreeing, Thompson commented that he knew Dorsey did not want the police going into his room. "Ain't got nothing in there," Dorsey responded.

Then Thompson told Dorsey he was going to show him how to "try to minimize this shit" because "we know it's a high profile case" and "a lot of people want to see it closed." "If you were me," Thompson said, "I would take the opportunity to kind of man up to it and say, hey, you know, I was drinking, I was, you know, I was on drugs or something" and "show some remorse." This was "the best route to take," Thompson added, because "we're trying to minimize it" and "right now, you got, you got the perfect opportunity to minimize." Thompson urged Dorsey that this was "something you should think about."

Dorsey replied that he could "do that in court." Thompson tried to dissuade Dorsey from taking that chance: "[S]ometimes you go to court," Thompson said, "and then, you know, all the facts and everything's stacked up against you and you try to fight it, you know what happens." "[Y]ou telling me you okay with going to jail?" Thompson asked. Dorsey answered, "No." In further back-and-forth, Thompson tried to assure Dorsey that, if he would "[m]an up," his situation was not as hopeless as he might think. Dorsey told Thompson his "life [was] pretty much done, anyway," and "if I lose, I lose. I ain't getting out anyway, so what the hell. It's a high profile case like you said, man, so, you know (indiscernible) give me about 70, 80 years, anyway, so what the hell." But Thompson told Dorsey he could avoid a long prison sentence ("[F]ollow me on

this") by saying he was on drugs and drinking and "you just really weren't in your right mind"—though Dorsey responded that this was not so [18]—and "go do yourself a little stretch [in jail], show them that you can be rehabilitated." Thompson explained that "it's really not about punishment anymore. It [*sic*] was a time that … jail was all about punishment. But now they do, they're going to rehabilitation. So, you know, you go do yourself a little stretch, show them that you can be rehabilitated."

Thompson then told Dorsey, "[t]he way I look at shit, in every negative there's a positive. If you get [a battery] man, it's a negative side and it's a positive side…. [R]ight now you're on the negative end … [but] if you work the shit right you flip it on around to the positive side…. Right now in this room, right here today, you got a chance to flip this shit around." Dorsey responded that there were "the courts to deal with that," and he wanted this case to go to court "[s]o you all stop messing with me." But Thompson persisted, telling Dorsey he did not want this particular "real strong" case to go to court. "[W]hen this case goes to court," Thompson stated, "we're going to have a nice strong case against you. A real strong case. We're going to have witnesses. We're going to have pictures. We're going to have DNA evidence. We're going to have all kinds of shit." Dorsey should plead guilty, Thompson advised him, "so all that shit would not have to be shown," and then "it would be just like a robbery, a straight robbery…. End of story. Then all that other shit don't come in."

### G. Dorsey Invokes His Right to Counsel; "You Don't Want That," Detective Thompson Tells Him

At approximately 2:51 a.m., Dorsey responded to Thompson's advice by telling him, "I want to talk—I need to talk to a lawyer now. I've been in this joint now how long now [indiscernible]?" [19] Thompson said, "you don't want, you don't want that. Only a fool would want a judge to see all this shit. You know?" But Dorsey insisted, saying, "I want to get me charged."

Thompson refused to quit. Observing that Dorsey was "nervous" and "sweating like a pig," he urged Dorsey to call his mother and ask her to pray for him, which would "set [his] conscience straight." Then, Thompson said, Dorsey should "talk to me, own up to this shit." Dorsey reiterated that he was "going to tell the court my side …, the same thing I told you all …, [and] let the court deal with it." Thompson countered that "the court is not going to be as sympathetic as I am" because this was such a "high profile case," one "that everybody's outraged about." Dorsey replied, "That's why I'm going to go to court."

Further exchanges followed. Dorsey's own mother would tell him to confess, Thompson said; in fact, he added, Dorsey "could not pick a better time to own up to this shit, because it's Mother's Day." Thompson asked Dorsey if his mother had ever been robbed and told him "you want people to look at you as … a compassionate guy" who got himself in trouble because he "maybe has a few problems."

---

18. Dorsey asserted in response that he had had only "one drink" on the day of the robbery and "kn[e]w pretty much what went on that day."

19. The government conceded at the suppression hearing that Dorsey invoked his Fifth Amendment right to counsel at this point.

But Dorsey repeatedly told Thompson he wanted to go to court.

Thompson said he would ask Detective Ross to come back into the room. Dorsey protested, "I just want to go to sleep. I don't want to fuck with him, man. I want to go to sleep.... I'm tired. I've been up now—how long I've been sitting on this chair. I want to lay down and go to sleep now." Thompson asked Dorsey if he wanted to prop his feet up in the chair; Dorsey said no, he wanted to go down to the cellblock and lie down, and he would not talk any more. To Thompson's proposal that they "take a little break, come back in," Dorsey reiterated, "I don't want to talk no more. I'm not saying nothing else." Thompson said he still wanted Dorsey to give him "a full statement as to what happened." Dorsey replied, "Nah, I already told you, I already told you that. I ain't—I'm just want to lay down. I want to lay down. You won't take me back, you all (indiscernible) that's why I want to go to court.... I should of just got a lawyer." Again, Thompson encouraged Dorsey to tell his side of the story, and again Dorsey refused. "I just want to lay down and go to sleep," Dorsey said. "I've been sitting up in this damn chair, man." He pleaded with Thompson to be taken down to the cellblock, saying, "I just want to lay, I just want to lay down. I want to lay down."

At around 3:00 a.m., Thompson left the interrogation room. He returned a few minutes later to ask if Dorsey wanted to call his mother. Dorsey declined to do so and Thompson departed, leaving Dorsey to sit alone in the room for the better part of the next five hours. Dorsey spent some of this time with his head down on the table, some of it mumbling to himself, and some of it shifting around and trying to lie down on the floor while still handcuffed to his chair. At around 4:45 a.m., Detective Tabron escorted him to the bathroom, and Dorsey asked when he would be taken to the cellblock. "When we finish up what we have to do," Tabron answered.

### H. "They Going to Up the Charges Unless You Tell the Truth. The Best Hope You Got Right Now Is to Show Remorse and Move On"

At 8:06 a.m., Ross and Tabron returned. Stating that he knew Dorsey was "ready to go lay down" and that "it's been a long day for everybody," Ross showed Dorsey the return on a search warrant the police had executed that morning at the room Dorsey rented. The return showed that the police had found and seized camouflage pants (which Dorsey earlier had denied owning) and other items. Ross asked Dorsey whether he "still want[ed] to stay with [his] story" and claimed the return was "proof" that Dorsey had lied to him earlier. Ross told Dorsey he had better tell the truth now and start showing remorse because his "whole story [was] falling apart":

> The jig is up, okay? There's no reason to keep lying. All you need to do now is explain to me, you know, some things went bad, I was tired. Tell the truth, that's all I'm asking. Things happen, you know. Remorse is what you need to do now. I made a mistake, I need drug treatment....

> The whole story is falling apart, okay? All I can do is go down there and represent to the United States Attorney you didn't mean to hurt that lady, you know, if that's what you want to say. But you know the jury could—you've seen the videotape on TV. You don't want to roll the dice on something like this.

Ross claimed he had Dorsey "[f]ive ways to Sunday" and mentioned he had found an eyewitness to the robbery—the driver of a "white car that came out the driveway

when you were doing your work." And then Ross delivered a warning:

> Jimmy, look at me, man. You've been around, I've been around. *They [i.e., the prosecutors] going to up the charges unless you tell the truth.* The best hope you got right now is to show remorse and move on. I'm telling you the truth. Think about it. Think about it. (Emphasis added.)

Dorsey responded that he wanted to lie down and go to sleep. Ross, joined by Tabron, returned to the subject of the witness in the white car. Tabron told Dorsey, "You might have missed that white car coming out the van port, but you did look back a couple times, you know, to check and see, you know, if anybody was behind you." Then Ross, who had gone out to meet with someone, came back and told Dorsey to lower his hood so that the driver of the white car could "take a look" at him. The witness purportedly walked by the room to see if he could identify Dorsey.[20]

The questioning then resumed. Tabron asked Dorsey to tell him "what happened." Dorsey responded that he would "hear [about] it in the courtroom when we go." Tabron asked for "a small scenario of what your story's going to be." Dorsey answered, "I don't know. I'm ready to go back to sleep." For the next several minutes, during which Thompson returned and joined in posing questions, Dorsey repeated that he needed sleep, he did not want to talk, and he was "done talking." Finally, Ross agreed to take Dorsey to his cell. As he was led out of the room at approximately 8:21 a.m. on Sunday, May 8,

Thompson said to him, "All right, bro. Good luck, man."

### I. Dorsey "Gets It Off His Chest" to "Take the Robbery"

Dorsey was taken to an individual cell. He remained there, by himself, until Sunday afternoon. During that time, he slept for about three hours and (in the words of the prosecutor who cross-examined Dorsey at the suppression hearing) "had a chance to think about what was going on."[21] Because Dorsey still had not confessed to the robbery of Ms. Fotopoulous, the detectives planned to resume his interrogation later that day. Dorsey may have realized that he would be facing further questioning because Ross earlier had told him the detectives would "take a run at this tomorrow after you get a few hours' sleep."

Between 3:30 and 4:30 p.m., however (according to the government's witnesses at the suppression hearing, whose testimony Judge Gardner credited over that of Dorsey), Dorsey called out from his cell and said he wanted to speak with Ross and confess. Dorsey was taken to an interview room while officers tried to reach Ross, who had gone home. While he was waiting in the room, Dorsey noticed Detective Crespo walking by the open door. Dorsey called to Crespo and again said that he wanted to confess. (Dorsey's calls and the police responses were not videotaped.)

Dorsey then was moved to the room in which he had been questioned the previous night. There he was interrogated (again on videotape) by Crespo and by Sergeant James Young, who had arrived that afternoon from the Metropolitan Police Department's Major Case Unit to help with Dor-

---

**20.** It is unclear from the record whether there really was a driver in a white car who was allowed to view Dorsey while he was in the interrogation room early Sunday morning.

**21.** Dorsey agreed with the prosecutor's characterization. He also agreed that he was not "intimidated" by being in the holding cell and knew he would be going to court the following day.

sey's questioning. The detectives did not re-advise Dorsey of his *Miranda* rights or ask him if he would waive those rights.[22]

At the outset, Crespo stated that Dorsey had called to him as he walked by, and "you obviously said you want to talk about this. Okay?" Dorsey said nothing, and Crespo continued by asking him to "be specific" and "tell us exactly what happened." Dorsey then proceeded to confess to the robbery and assault on Ms. Fotopoulous.[23] In the videotape of this Sunday afternoon interrogation, as Judge Gardner later observed in ruling on his motion, Dorsey appears calm and rested.

Dorsey began by explaining that, a week before the robbery, Fotopoulous had angered him by refusing to give him change for a twenty-dollar bill and screaming at him to get away from her cart. ("She got all smart and got foul, you know.") On the morning of the robbery, Dorsey said, a flower vendor he knew mocked him for having let Fotopoulous "talk to [him] like that" and encouraged him to get even by robbing her. Dorsey said he was "a little tipsy" at the time, having consumed a "whole pint" of vodka that morning, and he

was persuaded to do what the flower vendor suggested. He followed Fotopoulous home, confronted her in an alley, "pushed" her and knocked her down, and "asked her for her money." She resisted him and tried to get up, grabbing his wrist and refusing to let go. Dorsey held her down with his foot and hit her, grabbed her money out of her jacket, and ran.[24] He used the stolen money (around $300) to pay his rent.

Dorsey insisted that he had not intended to hit Fotopoulous. He said he did so only because he was "mad [that he] couldn't get the money" from her. He repeatedly stated that he had not realized Fotopoulous was "that old"[25] and claimed he had never robbed a woman before. He said he felt bad about having assaulted Fotopoulous. When Young asked him if he felt "remorseful," Dorsey remarked, "If that would have happened to my mother, man. . . ."

In response to the detectives' questions, Dorsey agreed that they had not "forced anything" on him or "made [him] do any-

---

**22.** Crespo and Young testified at the suppression hearing that they had not been told Dorsey had asserted his Fifth Amendment rights during his earlier interrogation.

**23.** In his testimony at the suppression hearing, Dorsey denied having asked to speak to Ross or Crespo. He testified that, after he had been in his cell for about five hours, an officer asked him if he wanted anything to eat and escorted him back to the interrogation room. This officer then tried to ask him some questions about his refusal to "give in," but Dorsey told him he did not want to talk about it and thought the police had finished interviewing him. Dorsey claimed that Crespo and Young then entered the room and told him that if he would "take the robbery charge," they would talk to the prosecutor about his being released from jail when he went to court the next day, and he would be "treated more leniently." Dorsey claimed

this inducement was the reason he made the "choice" to confess. Judge Gardner, noting how Dorsey was contradicted by the videotape and by the detectives' testimony at the suppression hearing, stated that he did not believe "one word" of Dorsey's account.

**24.** The detectives asked Dorsey if he had put something like a sock on his hand when he attacked Fotopoulous. He denied it, though Young told him to "think about it before [he] answer[ed]" and asked him if he was "sure."

**25.** Dorsey, who was 46 years old himself, claimed that he had "thought she was probably in about her fifties." But when Crespo asked him what she had looked like, he described her as "just a old white lady" with "white hair." Dorsey never explained how he could have failed to realize that Fotopoulous was elderly.

thing" against his will.[26] When Young asked what made him decide to confess, Dorsey said he knew he would "probably never get out [of jail] again," so "I might as well just go on and come clean with you, you know, just get it off my chest." A few minutes later, though, Dorsey declared that he knew the police had "no case" against him and he "probably" could have beaten the charge in court.

After he made those conflicting statements, Dorsey manifested a keen interest in minimizing his exposure to incarceration. When the interrogation was almost finished, Crespo thanked Dorsey, saying, "Well, Jimmy, I've known you a long time. I appreciate your talking to us." A few moments later, Young left the room. Alone with Crespo, Dorsey said, "So . . . don't put no whole lot of extra charges, you know. . . . I'm going to take the robbery, you know." Crespo responded that he was "not in charge of what happens to you." Dorsey acknowledged this but continued to voice concern over the charges he would be facing now that he had "come clean." Crespo reiterated that it was "not my job to determine what happens to you." "I know that," Dorsey answered, but he repeated that he did not "need [a] whole lot of charges, you know. . . . I'll take, I'll take, I'll take the robbery you know. . . . [Y]ou know I don't need the assault and all

that other stuff. I just want to deal with the robbery." Crespo indicated that he understood and briefly left the room. After he returned to wrap up, Crespo said to Dorsey, "Like I said, I've known you a long time, and you've got to feel better about just getting it off your chest." Dorsey said, "Yeah," but then returned to the subject of his "tak[ing] the robbery." Crespo said, "I got you" and changed the subject.

## J. The Ruling on the Motion to Suppress

▆ In argument before Judge Gardner, the government conceded that Dorsey had invoked his Fifth Amendment right to counsel on Sunday morning when he declared at around 2:51 a.m. that he "need[ed] to talk to a lawyer now." Dorsey contended that he had asserted his Fifth Amendment right to remain silent earlier, when he said he did not want to talk about Diane and again when he repeatedly asked to be returned to his cell to get some sleep. Ultimately, Judge Gardner ruled that Dorsey's first unambiguous invocation of his Fifth Amendment right to cut off all questioning and remain silent occurred when he asked at around 11:10 p.m. on Saturday night to be taken back "now" to the cellblock and allowed to sleep.[27] From that point on, the judge

---

**26.** At the suppression hearing, Dorsey assented on cross-examination to the prosecutor's assertion that his statement to the detectives "meant that [he had] been in the system long enough that [he] didn't believe what the police had been telling [him] the night before." Dorsey nonetheless refused to agree that he "didn't change [his] mind because of anything the police officers said to [him]." Judge Gardner, noting Dorsey's long hesitation before he gave that answer, discredited it.

**27.** Although the government disputed this conclusion at the suppression hearing, on appeal it does not contest the judge's determination that as of 11:10 p.m., Dorsey unam-

biguously asserted his right to terminate the interrogation and remain silent. *See Berghuis v. Thompkins*, 560 U.S. ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (holding that "an accused who wants to invoke his or her right to remain silent [must] do so unambiguously").

We agree with Judge Gardner's determination. A suspect need not refer explicitly to his constitutional rights or use any particular form of words in order to convey his unwillingness to be questioned further; "any declaration of a desire to terminate the contact or inquiry (e.g., "Don't bother me") should suffice." 2 Wayne R. LaFave et al., CRIMINAL

stated, the detectives were "obligated to cease the discussion"; and because they violated Dorsey's constitutional rights by continuing to interrogate him, his subsequent statements during his overnight interrogation had to be suppressed and could not be introduced by the government in its case-in-chief at trial.[28]

Judge Gardner further ruled that, after there had been "a significant break in the questioning," Dorsey "initiated" the second round of his interrogation when he asked to speak to Ross and Crespo on Sunday afternoon. As previously mentioned,[29] the judge disbelieved Dorsey's testimony that he never indicated he wanted to confess. Moreover, Judge Gardner concluded, the initiation was not the product of "coercion" or "subterfuge" by the police but, rather, was motivated by the feelings of remorse Dorsey expressed to the police when he confessed: "[H]e didn't know that lady was that old," and "he wanted to get it off his chest." In reaching these conclusions, the judge did not address whether Dorsey's feelings of remorse and resultant decision to confess were influenced by the interrogation that followed his request for counsel or whether the requirements of *Edwards v. Arizona* were satisfied regardless of such influence.

Turning next to the question of whether Dorsey validly waived his Fifth Amendment rights and voluntarily confessed, Judge Gardner did not discuss Crespo and Young's failure to re-advise Dorsey of his

Fifth Amendment rights or obtain an express waiver from him before they resumed his interrogation; nor did the judge consider whether the possibility of a valid waiver was undermined by the detectives' earlier *Miranda* violations. The judge instead based his determination largely on Dorsey's demeanor during his confession on Sunday afternoon. After viewing the videotape, the judge found that Dorsey "was talking just as matter [of] factly and just as plain and just as undisturbed as anybody I have ever [seen]." The judge saw no "hint" of coercion. "That man was sitting there telling that story for the reason that he posited," the judge said. "He wanted to get it off his chest and he didn't know that woman was so old and I believe that is why he made the statement that he made, unprompted, uncoerced, unforced." Furthermore, Judge Gardner found, Dorsey knew the police could not determine his sentence or "do anything for him downtown" other than "tell the prosecutor" about his cooperation. With his experience, the judge said, Dorsey understood the criminal justice system "well enough to know what he was doing"; he "knew about a waiver" because he had signed the rights card at the beginning of the interrogation on Saturday night, and he had a substantial criminal record.

Judge Gardner concluded that Dorsey voluntarily initiated the resumption of his interrogation on Sunday afternoon, validly waived his Fifth Amendment rights, and

PROCEDURE § 6.9(g) (3d ed.2007) (footnote omitted). In asking to be taken back to the cellblock "now," after having made several similar requests in the preceding hour, Dorsey was not seeking merely to *postpone* his interrogation so he could sleep (as Judge Thompson suggests, *see post* at 1207 n. 2). Nor was Dorsey proposing that his holding cell would be a more congenial spot for further interrogation. Any reasonable police officer would have understood that Dorsey

meant "he did not want to talk with the police" any more. *Berghuis,* 130 S.Ct. at 2260. Dorsey therefore did all he needed to do to invoke his right to end the interrogation and remain silent. *Id.*

28. The judge also suppressed any earlier statements about Diane Bush made by Dorsey after he said he did not want to talk about her. *See supra* note 9.

29. *See supra* note 23.

freely confessed. The judge therefore denied Dorsey's motion to suppress his confession.

## II. Discussion

◼ In reviewing the denial of a motion to suppress statements on constitutional grounds, we must defer to the trial court's findings of historical fact as long as they are not clearly erroneous, and we must view the facts and the reasonable inferences that may be drawn from them in the light most favorable to sustaining the court's ruling.[30] However, our review of the trial court's legal conclusions is *de novo*.[31] Thus, whether the record shows that Dorsey validly "initiated" further discussion with the police within the meaning of *Edwards* is a legal question subject to our *de novo* examination.[32] The same is true with respect to whether Dorsey validly waived his Fifth Amendment rights and voluntarily confessed.[33]

### A. *Miranda* and *Edwards*

◼ In *Miranda v. Arizona*,[34] the Supreme Court held that police must follow certain procedures to protect a suspect's Fifth Amendment privilege against compelled self-incrimination from the "inherently compelling pressures" of custodial interrogation.[35] Unless those procedures are followed, the Court stated, " 'no statement obtained from the defendant can truly be the product of his free choice.' "[36] In brief, to "counteract the coercive pressure" of custodial interrogation, the police must inform a suspect before any questioning that he has both a right to remain silent and a right to the presence of an attorney.[37] If, "at any time prior to or during questioning," the suspect invokes his right to remain silent, "the interrogation must cease."[38] If the suspect requests counsel, "the interrogation must cease until an attorney is present."[39]

◼ Furthermore, "[e]ven absent" the suspect's invocation of these Fifth Amendment rights, his "statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [his] rights' when making the statement."[40] For a waiver to be valid, it "must be 'voluntary in the sense

30. See *Jones v. United States*, 779 A.2d 277, 281 (D.C.2001) (en banc).

31. *Id.*

32. See, *e.g.*, *United States v. Whaley*, 13 F.3d 963, 968 (6th Cir.1994).

33. See, *e.g.*, *Graham v. United States*, 950 A.2d 717, 735 (D.C.2008) (voluntariness of confession); *Robinson v. United States*, 928 A.2d 717, 725 (D.C.2007) (voluntariness of waiver); *United States v. Sriyuth*, 98 F.3d 739, 748 (3d Cir.1996) (knowing and intelligent waiver).

34. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

35. *Id.* at 467, 86 S.Ct. 1602. "The Court observed that 'incommunicado interrogation' in an 'unfamiliar,' 'police-dominated atmosphere,' involves psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely[.]' " *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010) (quoting *Miranda*, 384 U.S. at 456–57, 467, 86 S.Ct. 1602).

36. *Shatzer*, 130 S.Ct. at 1219 (quoting *Miranda*, 384 U.S. at 458, 86 S.Ct. 1602).

37. *Id.*

38. *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602.

39. *Id.* at 474, 86 S.Ct. 1602.

40. *Berghuis v. Thompkins*, 560 U.S. ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)).

that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' "[41] "Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."[42] Thus, "any evidence that the [suspect] was threatened, tricked, or cajoled into a waiver will, of course, show that [he] did not voluntarily waive his privilege."[43] As to the knowledge component of a valid waiver, the suspect must have been "aware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation."[44] In other words, "the suspect [must have] know[n] that [his] *Miranda* rights [could] be invoked at any time."[45] And if the suspect was questioned after he declined to talk to the police without counsel, " '[t]he record must show ... that [he] was offered counsel but intelligently and understandingly rejected the offer. Anything else is not waiver.' "[46]

*Miranda* underscores the importance of the suspect's right to terminate his interrogation at any time: "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."[47] In *Michigan v. Mosley*,[48] the Supreme Court re-emphasized that the suspect's "right to cut off questioning" is the "critical safeguard" in *Miranda's* framework because "[t]he requirement that law enforcement authorities must respect a person's exercise of that option" is what effectively serves to "counteract[ ] the coercive pressures of the custodial setting."[49] Accordingly, the Court concluded, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' "[50]

In *Edwards v. Arizona*,[51] the Supreme Court focused on the special significance of a suspect's request to have counsel present during questioning. The Court concluded

41. *Berghuis*, 130 S.Ct. at 2260 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)); *see also Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ("[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege[.]"). The validity of a waiver thus "depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

42. *Moran*, 475 U.S. at 421, 106 S.Ct. 1135 (internal quotation marks omitted).

43. *Miranda*, 384 U.S. at 476, 86 S.Ct. 1602.

44. *Berghuis*, 130 S.Ct. at 2262.

45. *Id.* at 2264.

46. *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602 (quoting *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962)).

47. *Id.* at 474.

48. 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

49. *Id.* at 104, 96 S.Ct. 321.

50. *Id.* (quoting *Miranda*, 384 U.S. at 474, 479, 86 S.Ct. 1602).

51. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

that even the requirement of a knowing, intelligent, and voluntary waiver is not sufficient by itself to protect a suspect's Fifth Amendment right against compelled self-incrimination once the suspect has asked for counsel; in that situation, "additional safeguards are necessary."[52] The Court accordingly added what it subsequently called a "second layer of prophylaxis,"[53] holding that once a suspect in custody has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police."[54]

■■■■■ "If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver

and his statements would be considered voluntary under traditional standards."[55] And even if the suspect, after having terminated the interrogation by invoking his right to counsel, later chooses to initiate further discussion about the criminal investigation,[56] the police must obtain "a valid waiver of the right to counsel and the right to silence" before resuming the interrogation.[57] In short, under *Edwards*, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."[58]

■■■■ The rationale of *Edwards* is that, "to a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect

**52.** *Id.* at 484, 101 S.Ct. 1880.

**53.** *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

**54.** *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880.

**55.** *McNeil*, 501 U.S. at 177, 111 S.Ct. 2204. The "request for counsel ... raise[s] the presumption that [the suspect] is unable to proceed without a lawyer's advice." *Arizona v. Roberson*, 486 U.S. 675, 683, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *see also Michigan v. Harvey*, 494 U.S. 344, 353, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (explaining that *Edwards* adopted a prophylactic rule "that render[s] some otherwise valid waivers of constitutional rights invalid when they result from police-initiated interrogation"); *Minnick v. Mississippi*, 498 U.S. 146, 151, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (*"Edwards* conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of *Miranda* in practical and straightforward terms.").

**56.** Not all inquiries or statements by a suspect amount to "initiation" for purposes of *Edwards*. For example, inquiries "relating to routine incidents of the custodial relationship[ ] will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion). Typically, to effect an *Edwards* "initiation," the suspect must "evince a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045–46, 103 S.Ct. 2830; *accord id.* at 1055, 103 S.Ct. 2830 (Marshall, J., dissenting).

**57.** *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. 1880; *see also id.* at 482, 101 S.Ct. 1880 (reciting the familiar requirement that waiver of counsel must be knowing, intelligent, and voluntary).

**58.** *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

may be feeling." [59] As the Court elaborated in *Shatzer*, "[i]t is easy to believe that a suspect may be coerced or badgered into abandoning his earlier refusal to be questioned without counsel in the paradigm *Edwards* case, in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated." [60] Accordingly, "[t]he *Edwards* presumption of involuntariness" is intended to "ensure[ ] that police will not take advantage of the mounting coercive pressures of prolonged police custody, by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission." [61]

■ The suspect-initiation rule shares the same "fundamental purpose[,] to preserve the integrity of an accused's choice to communicate with police only through counsel, by preventing police from badgering a defendant into waiving his previously asserted *Miranda* rights." [62] Initiation by the suspect is meaningful where the suspect "knows from his earlier experience that he need only demand counsel to bring the interrogation to a halt" because then "[h]is change of heart is less likely attributable to 'badgering' than it is to" uncoerced deliberation on his part. [63] But that is not so where the police have disregarded the suspect's assertion of his Fifth Amendment right to counsel by "persisting in repeated efforts to wear down his resistance and make him change his mind." [64] Because such efforts convey to the suspect that he *cannot* halt his interrogation by demanding counsel, they render it likely that his subsequent expression of a willingness to engage in further discussions without a lawyer *is* the product of the impermissible badgering. If so, the suspect's purported "initiation" does not mean what it is supposed to mean. It therefore does not satisfy *Edwards's* preconditions for the resumption of the interrogation. As the Eleventh Circuit has put it,

> Although *Edwards* permits further interrogation if the accused initiates the conversation, the validity of this . . . logically depends on the accused being free from further interrogation. In other words, the "initiation" must come prior to the further interrogation; initiation only becomes an issue if the agents follow *Edwards* and cease interrogation upon a request for counsel. . . . *Edwards* would be rendered meaningless if agents were permitted to continue interrogation after the request for counsel, and then claim that the consequent response by the accused represented initiation and permitted a waiver of the asserted counsel right. [65]

---

59. *Roberson*, 486 U.S. at 686, 108 S.Ct. 2093.

60. *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045 (2010) (internal quotation marks and citation omitted).

61. *Id.* (internal quotation marks and citation omitted); *see also Smith*, 469 U.S. at 98, 105 S.Ct. 490 ("In the absence of such a bright-line prohibition, the authorities through 'badgering' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.").

62. *Shatzer*, 130 S.Ct. at 1220 (internal quotation marks, brackets, and citation omitted).

63. *Id.* at 1221.

64. *Michigan v. Mosley*, 423 U.S. 96, 105–06, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

65. *United States v. Gomez*, 927 F.2d 1530, 1538–1539 (11th Cir.1991) (citation omitted); *see also Commonwealth v. Ferguson*, 278 Va. 118, 677 S.E.2d 45, 49 (2009) ("The silence was broken when the coercive environment, the threats, the cajoling, the promises of assistance in return for cooperation, and the fail-

In short, as conceived by the Supreme Court in *Edwards*, suspect-initiation is not a mere formality. It is a necessary additional check against official overreaching—a check that can be furnished only if the initiation accurately reflects that the suspect was *not* pressured by the police to change his mind. Treating the "delayed product" of police badgering as a valid "initiation" would serve no purpose; it would exalt form over substance and thwart rather than implement the goal of the Court in *Edwards*.[66]

Therefore we reject, as inconsistent with *Edwards*, the government's position that "the only relevant questions for the initiation part of an *Edwards* analysis are what the defendant did and what his words meant [and that i]nquiry into alleged police coercion belongs [only] in the second half of the analysis, which considers whether waiver was knowing, intelligent, and voluntary."[67] The *Edwards* Court adopted the supplemental suspect-initiation requirement in order to provide meaningful *additional* protection against the badgering tactic—beyond that provided by the requirement of a valid waiver—to suspects in custody who have asked for counsel. Under *Edwards*, police badgering *must* be relevant to whether the suspect made a valid initiation (as well as a valid waiver) because the initiation requirement cannot serve its purpose if the police can satisfy it by badgering the suspect into reopening a new round of questioning. And dismissing badgering as irrelevant to initiation not only would defeat what the Supreme Court sought to accomplish in *Edwards*, it would turn the initiation requirement on its head. Instead of preventing the police from badgering suspects who have requested counsel, the initiation rule would incentivize them to do so.[68]

 Our conclusion that a suspect's delayed response to improper post-invocation custodial interrogation cannot be deemed a valid initiation under *Edwards* does not mean that a valid initiation is categorically impossible whenever the po-

---

ure to honor Ferguson's request for counsel had its intended effect.... Whatever the significance of Ferguson's comments that broke the silence, they were the product of the coercive interrogation and environment created by police. Surely, police may not use the product of such techniques as proof of a voluntary reinitiation of communication and subsequent waiver of the right to counsel.").

66. *See Collazo v. Estelle*, 940 F.2d 411, 423 (9th Cir.1991) ("Although the words and even the actions that could normally be construed as 'initiation' were present at the outset of the second encounter, an analysis of the substance of the entire transaction—rather than the isolated form of the second encounter—demonstrates that Collazo did not 'initiate' further conversation as that term is used in *Edwards*. ... [Rather,] Collazo's words and actions in calling back the officers and in 'waiving' his rights were nothing less than the *delayed product* of [the police officer's *Miranda* violation] three hours previously." (emphasis in original)).

67. Brief for Appellee at 29.

68. When a suspect asks for counsel, the police know they will not be able to continue trying to elicit his confession while he is still in their custody unless the suspect "initiates" another round of interrogation. The suspect is unlikely to do that on his own. *See Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (noting that *Edwards* "is based on the supposition that suspects who assert their right to counsel are unlikely to waive that right voluntarily in subsequent interrogations"). For that reason, there is little downside to badgering the suspect to change his mind, but there is a big potential upside. Badgering the suspect might persuade him to "initiate" further dialogue with the police, waive his *Miranda* rights, and confess; and if the validity of his waiver is the only real legal hurdle to overcome, the totality-of-the-circumstances analysis may permit admission of the confession. This scenario, of course, is exactly what *Edwards* was intended to prevent.

lice have violated *Edwards's* "bright-line prohibition" of such interrogation.[69] Although the Supreme Court has been receptive to the adoption of bright-line rules to implement *Edwards*,[70] we believe that a *per se* rule barring the government from ever showing a valid initiation following improper police questioning of a suspect in custody after a request for counsel would be overly broad, and we do not discern that it is required to effectuate *Edwards*.[71] But the violation of *Edwards* does engender a cause-and-effect presumption that the government has the burden of overcoming if it is to reap the benefits when the suspect reopened the dialogue with the police. To show that the reopening constituted a valid initiation within the meaning of *Edwards*, the government must show that it was not reasonably attributable to the post-invocation questioning.[72] This standard permits suspects the freedom to act on genuinely unbadgered impulses to talk with the police notwithstanding the violation of *Edwards*.

 The government's burden of proof is not an unreasonable one. We do not hold, as Judge Thompson implies, that in order to prevail the government must " 'totally eliminate the possibility' that something police officers improperly said or did, after a suspect invoked his *Miranda* rights, remained in his memory when he decided to resume speaking with police." [73] The applicable standard of proof is simply a preponderance of the evidence[74]; the question is causation, not whether all traces of the improper post-invocation questioning were wiped from the defendant's mind. The impact of such questioning depends on the circumstances. To begin with, an *Edwards* violation may be inconsequential; the police may not have

**69.** *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

**70.** *See Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 1222–23, 175 L.Ed.2d 1045 (2010) (adopting bright-line rule in lieu of case-by-case adjudication in holding that two weeks must pass following a suspect's release from custody before the *Edwards* presumption of involuntariness expires and police may seek to interrogate the suspect after he asked for counsel).

**71.** In his concurring opinion in *Collazo*, Judge Kozinski proposed such a *per se* rule:
In my view, however, the police forfeit the benefit of the *Edwards* exception once they use the type of pressure tactics demonstrated in this record. Because *Edwards* is designed to prevent police from badgering suspects into giving up their right to counsel, the narrow exception to *Edwards* cannot apply in a case where the police actually engaged in badgering. If police want to keep the *Edwards* escape hatch open, they must cease their interrogation as soon as the suspect asserts his right to counsel, and then hope he changes his mind on his own. Any other rule would invite police misconduct and enmesh the courts in the type of

metaphysical unscrambling of which this case is a perfect example.
940 F.2d at 427.

**72.** *See State v. Yoh*, 180 Vt. 317, 910 A.2d 853, 863 (2006) ("The only question we must answer is whether the tactics employed in the second interview [in which police violated *Miranda* and *Edwards* ] contributed to appellant's decisions to initiate the third interview, waive his *Miranda* rights ..., and make a confession.").

**73.** *Post* at 1213 (quoting *Riley v. United States*, 923 A.2d 868, 884 n. 17 (D.C.2007)).

**74.** *See Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *see also United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

badgered the defendant at all, and their misstep may have been too trivial, marginal, or limited in scope and intensity to have had any plausible causative effect on the defendant. In some cases, moreover, the passage of time or a favorable change in the defendant's circumstances may have diluted the impact of the violation or mooted its significance to the defendant.[75] Or the police may have taken effective curative measures to redress the *Edwards* violation and dispel its influence on the defendant[76]—for example, by substituting new interrogators who disavowed or corrected what the former interrogators improperly had said to the defendant; by re-advising the defendant of his Fifth Amendment rights and (especially) granting his request to confer with counsel; or by releasing the defendant from custody. An intervening event such as a communication with a third party also may have severed any connection between the violation and the defendant's resumption of communication with the police.[77] Thus, while the government must shoulder the burden of proving that the suspect's "initiation" was not the fruit of the *Edwards* violation, it is not an im-

possible task. Judge Reid's fear that this requirement will "eviscerate[ ] the possibility of the suspect's voluntary initiation of a conversation with police officers after a break in impermissible interrogation and an opportunity to rest and sleep away from the pressures of the interrogation room," *post* at 1221, is unwarranted.

Moreover, our holding does not involve any "expansion of the *Miranda* and *Edwards* prophylactic rules," as Judge Reid claims. *Post* at 115. Rather, we faithfully adhere to the dictates of *Edwards* and eschew the adoption of a novel and overbroad rule of any kind: We reject *both* a *per se* rule that a valid initiation is categorically impossible following an *Edwards* violation (which would be a new prophylactic rule) *and* a *per se* rule that *Edwards's* initiation requirement is automatically satisfied as long as there was some hiatus between the improper post-invocation questioning and the suspect's response to it. An inflexible rule of the latter kind must be rejected because a break does not *necessarily* dispel the impact of improper badgering on a suspect who has asked for

**75.** *See, e.g., Hill v. Brigano,* 199 F.3d 833, 842 (6th Cir.1999) ("Taking into account both the time lapse between the impermissible interrogation and the incriminating statements by the defendant and the fact that the defendant was aware that he had been assigned counsel, we believe the trial court was correct in analyzing the admissibility of this evidence under the initiation exception to *Edwards.*"); *Collazo,* 940 F.2d at 421 (listing "factors that are relevant to determining the effect of previous police coercion," including "whether (1) there was a break in the stream of events sufficient to insulate the statement from the effect of the prior coercion, (2) it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a change in the location of the interrogation, or a change in the identity of the interrogators interrupted the effect of the coercion, and (4) the conditions that would have precluded the use of a first statement had been removed").

**76.** *Cf. Missouri v. Seibert,* 542 U.S. 600, 622, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (Kennedy, J., concurring in the judgment) (stating that where police use an improper "question-first" interrogation technique to undermine effectiveness of subsequent *Miranda* warnings, "postwarning statements that are related to the substance of prewarning statements must be excluded *unless curative measures are taken* before the postwarning statement is made" (emphasis added)).

**77.** *Cf. Riley v. United States,* 923 A.2d 868, 885 (D.C.2007) (holding that the "key factor in prompting" the defendant to confess was a meeting he requested with a co-defendant and that defendant's waiver of his *Miranda* rights was "not tainted" by a detective's earlier, "serious, but ultimately inconsequential, misstep" in not scrupulously honoring the defendant's right to remain silent).

an attorney. To hold that a delayed response to such badgering is a valid initiation as a matter of law, regardless of the circumstances surrounding the interrogation and the break, would constitute an unprecedented and unjustified contraction of the *Edwards* rule.[78]

## B. Whether Dorsey's Request to Reopen Discussion with the Police Constituted a Valid Initiation Under *Edwards*

■■■ There is no question that the police improperly badgered Dorsey to confess after he asserted his Fifth Amendment right to counsel. Detective Thompson's immediate response was to tell Dorsey, "you don't want to do that" and that "[o]nly a fool would want a judge to see all this shit." In the next five-and-one-half hours, Thompson, Ross and Tabron persisted in trying a variety of techniques to persuade Dorsey to give in and confess. They deprived him of needed sleep, ignored his evident physical discomfort and symptoms of alcohol withdrawal, and emphasized his powerlessness until they "finish[ed] up what [they] ha[d] to do." They disparaged Dorsey's desire to talk to a lawyer and to go to court, implying that counsel would give him bad advice and that he could not receive a fair trial. They told

him to stop lying, presented him with additional incriminating facts (the search warrant return, the supposed eyewitness in the white car), and insisted that his "story" was "falling apart" as the evidence against him mounted to the point that Ross had him "[f]ive ways to Sunday." Thompson said that he would be more "sympathetic" than a court would be in this "high profile case" that had made "everybody ... outraged." He appealed to Dorsey's "conscience" and his feelings for his mother (implicitly comparing her to the victim in this case by asking Dorsey if she ever had been robbed), encouraged him to call her, and opined that his mother herself would tell him to confess.

Dorsey's "best hope," Ross reiterated, was to show remorse. The detectives even suggested how he could do so. "[Y]ou want people to look at you as ... a compassionate guy [with] maybe a few problems," Thompson advised. (Thompson previously had told Dorsey he could say he had been drinking or on drugs.[79]) "All you need to do now," Ross recommended, "is explain to me, you know, some things went bad, I was tired.... I made a mistake, I need drug treatment.... [Y]ou didn't mean to hurt that lady, you know, if that's what you want to say." Ross reminded

---

78. Acknowledging that we do not, in fact, adopt a *per se* rule, Judge Reid somewhat inconsistently complains that the necessary inquiry into whether a suspect's "initiation" was the fruit of an *Edwards* violation "has obvious potential for confusing, conflicting, and fact-intensive panel opinions based upon the subjective views of appellate judges." *Post* at 1224. This concern is vastly overblown. A factual inquiry is always required to determine whether the initiation and waiver requirements of *Edwards* and *Miranda* are satisfied, regardless of whether the police are alleged to have violated *Edwards* by continuing to question a suspect after he has invoked his right to counsel. Similarly, trial

and appellate courts routinely engage in fact-intensive inquiries in all manner of cases to determine whether evidence is the fruit of a constitutional violation. There is nothing unique or especially difficult about an inquiry into whether a suspect's decision to resume talking to the police was the product of improper, post-invocation badgering. We can expect, however, that because police usually comply with their obligations under *Edwards*, the question will arise infrequently.

79. That was shortly before Dorsey asked for counsel, but well after he had tried to terminate the interrogation by invoking his right to silence.

Dorsey of what was depicted on the videotape of the robbery and offered to "represent to the United States Attorney" that Dorsey did not mean to hurt Fotopoulous. And invoking both his and Dorsey's experience with the criminal justice system, Ross warned Dorsey that the prosecutors would "up the charges" if he did not confess. "I'm telling you the truth," Ross added, "Think about it, Think about it."

This was badgering with a vengeance. The detectives did nothing to mitigate it. That they finally allowed Dorsey to sleep for a few hours and then "think about what was going on" was not calculated to dispel the influence of such intensive badgering. What, after all, was Dorsey expected to "think about" as he sat alone in his cell if not the barrage of blandishments and threats he had endured? In the few hours Dorsey was given to sit and stew in his cell, he continued to be "cut off from his normal life and companions, thrust into and isolated in an unfamiliar, police-dominated atmosphere, where his captors appear[ed] to control his fate."[80] The common-sense premise of *Miranda* and *Edwards* is that the pressures of custodial interrogation only "*increase* as custody is prolonged."[81] And when Detective Crespo and Sergeant Young interviewed Dorsey on Sunday afternoon, they took no curative measures at all to counter the impact of the improper badgering Dorsey had endured. Indeed, Crespo and Young did not even take the trouble to re-advise Dorsey of his *Miranda* rights before they picked up where Ross and Thompson had left off.

Revealingly, Dorsey echoed the post-invocation badgering when he confessed. As Ross and Thompson had encouraged him to do, Dorsey expressed remorse and compassion, claiming he never meant to hit Fotopoulous and did not realize she was elderly. The detectives had compared Fotopoulous to Dorsey's mother; so did Dorsey ("If that would have happened to my mother, man . . . ."). In line with another suggestion, Dorsey said he had been drinking and was intoxicated ("tipsy") when he was persuaded to commit the robbery. Dorsey urgently repeated that he "just want[ed] to deal with the robbery" and did not "need the assault and all that other stuff" that Ross had suggested he could avoid by confessing. And while at one moment Dorsey professed to believe the police had "no case" on him, he revealed how effectively Ross had persuaded him otherwise when he explained why he had decided to confess: because he knew he was never getting out of jail anyway— at least not unless he could just "take the

---

**80.** *Maryland v. Shatzer,* 559 U.S. 98, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045 (2010) (internal quotation marks, citation, and brackets omitted). Under *Shatzer,* if the detectives had refrained from impermissible badgering and released Dorsey instead of holding him, they still would have been obliged to wait *fourteen days* for him to "shake off any residual coercive effects of his prior custody" before they could undertake to question him again. *Id.* at 1223. If the coercive effects of custodial interrogation are so profound that it takes two weeks in the community for them to dissipate even in the absence of police badgering, a few hours alone in a holding cell cannot be considered enough time for a suspect to "shake off" egregious badgering of the sort exhibited here.

**81.** *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (emphasis added); *see also Shatzer,* 130 S.Ct. at 1220 ("The *Edwards* presumption of involuntariness [was designed to] ensure[ ] that police will not take advantage of the *mounting* coercive pressures of 'prolonged police custody' by repeatedly attempting to question a suspect who previously requested counsel until the suspect is 'badgered into submission[.]'" (emphasis added) (citations omitted)).

robbery" · and avoid the other serious charges he was facing.[82]

That Dorsey may have decided to confess out of genuine remorse, as Judge Gardner found, does not mean his initiation decision was unprompted by the post-invocation badgering. It only confirms the effectiveness of the detectives' explicit, repeated appeals to Dorsey's conscience. There is no evidence that Dorsey felt remorse or compassion before the detectives set to work to arouse such sentiments, or that his expressions of remorse were anything but the product of their improper efforts.

Our dissenting colleagues argue that Dorsey was not vulnerable to the detectives' interrogation techniques because he was a "seasoned veteran" of criminal proceedings. *Post* at 1218–19, 1223–24. But Dorsey's adoption of the detectives' prompts in his confession belies the view that he was "impervious ... to the detectives' questioning and cajoling." *Post* at 1210. By focusing on the strength of the evidence against Dorsey, the outrage the case had generated, the hostile reaction Dorsey would confront in court, the punishment he could receive, and the benefits he would reap by coming clean and showing remorse, the detectives employed tactics calculated to be most persuasive to someone with Dorsey's experience with criminal prosecution and incarceration.

In sum, the detectives violated *Edwards* by continuing to press Dorsey to confess after he invoked his right to counsel. The government's burden was to overcome the presumption that Dorsey succumbed to that pressure when he decided to talk to Crespo and Young. We conclude that the government has not carried that burden. The record before us therefore does not permit a finding that Dorsey validly "initiated" the resumption of his interrogation within the meaning of *Edwards* after the post-invocation badgering he endured. For this reason, we hold, Dorsey's confession should have been suppressed.

### C. The Validity of Dorsey's Purported Waiver of His Fifth Amendment Rights

Even if we were to posit that Dorsey's request to speak with the detectives on Sunday constituted a valid initiation under *Edwards*, the admissibility of his responses to subsequent interrogation depended on whether the detectives then obtained a valid waiver from Dorsey of his Fifth Amendment rights to remain silent and to have counsel.[83] Although Dorsey previously had asserted those rights, Crespo and Young did not re-advise him or obtain an explicit waiver from him before they resumed his interrogation. On its face, this omission was in contravention of *Edwards*. It is immaterial that Crespo and Young may not have known that Dorsey had invoked his right to remain silent and requested counsel. "[O]fficers who interrogate a suspect after the suspect has invoked his right to counsel are charged

---

82. It is true, as Judge Thompson argues, that the themes of the post-invocation badgering Dorsey echoed in his confession had their roots in the detectives' pre-invocation interrogation. *See post* at 1213–14. We cannot conclude, however, that the intensified repetition and amplification of those motifs after Dorsey asked for a lawyer were innocuous. Indeed, it seems most plausible that the repetition was the key to getting Dorsey to capitulate and confess. That, after all, was why the detectives continued to badger Dorsey after he asked for an attorney—because they thought their techniques would wear him down.

83. *See Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. 1880; *see also id.* at 482, 101 S.Ct. 1880.

with the knowledge of the prior invocation." [84]

▮ By itself, though, the detectives' failure to obtain an express waiver from Dorsey is not conclusive of our inquiry because, under *some* circumstances, an implied waiver may be found.[85] The government relies on the Supreme Court's holding in *Berghuis* that "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." [86] *Berghuis* was a very different case from this one, however. That case did not involve a suspect who had asserted his rights to remain silent and to have counsel present or a second interrogation of the suspect following improper police badgering. These differences must not be ignored in applying *Berghuis's* "general proposition" that, under benign circumstances, a valid waiver may be implied.[87] Even absent improper badgering, when the suspect has asserted his Fifth Amendment rights, one of the main factors bearing on whether the police have "scrupulously honored" those rights before interrogating him further is whether the police re-administered "full and complete *Miranda* warnings at the outset of the second interrogation," so that the suspect was "reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options." [88] A failure by the police to take those steps and obtain an express waiver before resuming the interrogation is especially significant if the suspect asked specifically for counsel because that request in particular "raise[s] the presumption that [the suspect] is unable to proceed without a lawyer's advice." [89] We do not read *Berghuis* as retreating from these principles. At a minimum, therefore, where a suspect has explicitly and unambiguously asserted his right to counsel, the absence of an equally explicit and unambiguous renouncement of that right will make it substantially more difficult for the government to show a valid waiver; all the more so if the record shows that the police badgered the suspect to abandon his rights.

In the present case, of course, the police did not "scrupulously honor" Dorsey's Fifth Amendment rights. There is no dispute that Detectives Ross and Thompson badgered Dorsey with carrot and stick to waive his rights and confess after he futilely invoked his right to remain silent [90] and even after he asked for counsel. Their violations of *Miranda* were flagrant: Ross and Thompson persisted in questioning Dorsey and urging him to change his mind

84. *Alston v. Redman,* 34 F.3d 1237, 1243 (3d Cir.1994); *accord United States v. Covington,* 783 F.2d 1052, 1055 (9th Cir.1985); *United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir.1983). "[C]ustodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel." *Arizona v. Roberson,* 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

85. *See North Carolina v. Butler,* 441 U.S. 369, 375–76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)

(rejecting "inflexible *per se* rule" that "an explicit statement of waiver is ... invariably necessary to support a finding that the defendant waived" his *Miranda* rights).

86. *Berghuis v. Thompkins,* 560 U.S. ——, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010).

87. *Id.*

88. *Mosley,* 423 U.S. at 104–05, 96 S.Ct. 321.

89. *Roberson,* 486 U.S. at 683, 108 S.Ct. 2093.

90. *See supra* note 27.

despite his repeated assertions of his constitutional rights; verbally abused him (e.g., by repeatedly calling him a liar); disparaged his request for counsel and a hearing in court as contrary to his best interests; misrepresented to him the benefits of confessing before consulting with counsel (e.g., telling Dorsey that he could plead to "a straight robbery" so that "all that other shit don't come in"); threatened that the prosecutors would "up the charges" if he did not confess; exaggerated the strength of the evidence against him; and fed him what he should say to put himself in a more appealing light. To condone such tactics would be contrary to the principles of *Miranda*[91] and *Mosley*.[92] On the egregious facts of this case, and in the absence of an express waiver, the government has a difficult task indeed to establish, by a preponderance of the evidence,[93] that Dorsey validly waived his Fifth Amendment rights after the break in his interrogation.

A valid waiver, whether it is express or implied, has a cognitive as well as a volitional dimension: it must be knowing, intelligent, and voluntary. In evaluating whether the government has carried its burden, we begin by considering whether the detectives' tactics disabled Dorsey

from relinquishing his rights knowingly and intelligently.[94]

### 1. Knowing and Intelligent

Judge Gardner found that Dorsey understood his rights and "knew about a waiver" because he had signed the rights card (at the beginning of the interrogation on Saturday night) and had substantial experience with the criminal justice system. The government similarly argues that Dorsey was "well acquainted with the rights card, as he himself noted"; he "never expressed confusion about his rights"; he "revealed his awareness of his rights" by his "initial waiver and later invocation"; and he "understood the consequences of waiving his rights," namely that "anything he said could be used against him in court."[95] The government further argues that Dorsey's "refusal to confess and his insistence on going to court, even after the police ignored his invocation of rights, confirms that the police conduct did not shake his understanding."[96]

These arguments miss the essential point. *Miranda* is concerned with the here-and-now of a custodial interrogation, not with whether the suspect can pass an examination on constitutional criminal procedure. The Supreme Court held that a suspect must be "adequately and *effectively* apprised of his rights."[97] To that end,

---

91. See *Miranda*, 384 U.S. at 476, 86 S.Ct. 1602 ("[A]ny evidence that the [suspect] was threatened, tricked, or cajoled into a waiver will, of course, show that [he] did not voluntarily waive his privilege.").

92. See *Mosley*, 423 U.S. at 104, 96 S.Ct. 321 ("[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" (quoting *Miranda*, 384 U.S. at 474, 86 S.Ct. 1602)).

93. See *Berghuis*, 130 S.Ct. at 2261.

94. See *Edwards*, 451 U.S. at 482–83, 101 S.Ct. 1880 (holding that lower court erred in con-

sidering only voluntariness of defendant's admission, without "separately focusing on whether [he] had knowingly and intelligently relinquished his right to counsel").

95. Brief for Appellee at 31–32.

96. *Id.* at 33.

97. *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602 (emphasis added). "[T]he effectiveness *Miranda* assumes the warnings can have must potentially extend through the repeated interrogation, since a suspect has a right to stop at any time." *Missouri v. Seibert*, 542 U.S. 600, 614 n. 5, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion); *see also id.* at 621,

the Court required "procedures that will warn a suspect in custody of his right to remain silent *and which will assure the suspect that the exercise of that right will be honored.*" [98] It is not enough that Dorsey was aware of his rights in the abstract and knew enough to try to assert them; every time he actually *did* assert his rights, his assertions were overridden and his rights were denied. Ross and Thompson thereby communicated to Dorsey that in *this* "high-profile" investigation, any attempts on his part to exercise his *Miranda* rights would be ignored. It was as if the detectives had told him explicitly that his *Miranda* rights were inoperative on this occasion. The government rejoins that while the detectives' "response indicated to appellant that his rights were not being honored[,] ... [t]hey did not suggest that he had no rights to claim." [99] But the Supreme Court rejected that distinction when it insisted on procedures that would "assure the suspect that the exercise of [his] right[s] will be honored." [100] The

Court appreciated that police actions speak louder than words. As Justice Stevens has put it: "When police have not honored an earlier commitment to provide a detainee with a lawyer, the detainee likely will 'understan[d] his (expressed) wishes to have been ignored' and 'may well see further objection as futile....' " [101] The prospect of obtaining a suspect's knowing and intelligent waiver of his rights vanishes after the police have demonstrated that those rights were "hollow" from the start. [102] In short, the government's distinction is an illusory one: "A right that is not honored when invoked is no right at all." [103]

Furthermore, Ross and Thompson compounded the seriousness of their *Miranda* violations by disparaging and devaluing Dorsey's rights—exhorting him that their assertion would work to his disadvantage while their relinquishment would benefit him. The detectives' threats and assur-

124 S.Ct. 2601 (Kennedy, J., concurring in the judgment) ("The *Miranda* rule would be frustrated were we to allow police to undermine its meaning *and effect.*" (emphasis added)).

98. *Dickerson v. United States*, 530 U.S. 428, 442, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (emphasis added).

99. Brief for Appellee at 33.

100. *Dickerson*, 530 U.S. at 442, 120 S.Ct. 2326.

101. *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213,1229, 175 L.Ed.2d 1045 (2010) (Stevens, J., concurring in the judgment) (quoting *Davis v. United States*, 512 U.S. 452, 472–73, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (Souter, J., concurring in the judgment)). *See also Arizona v. Roberson*, 486 U.S. 675, 686 n. 6, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), where the Court addressed the point as follows:

The United States ... suggests ... that 'respondent's failure to reiterate his request

for counsel ... even after [the officer] gave respondent complete *Miranda* warnings, could not have been the result of any doubt on respondent's part that the police would honor a request for counsel if one were made.' ... This conclusion is surprising, considering that respondent had not been provided with the attorney he had already requested, despite having been subjected to police-initiated interrogation with respect to the first investigation as well.

*See also Seibert*, 542 U.S. at 617, 124 S.Ct. 2601 (plurality opinion), 622 (Kennedy, J., concurring in the judgment) ·(condemning questioning technique that rendered *Miranda* warnings ineffective "to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk").

102. *Shatzer*, 130 S.Ct. at 1232 n. 11.

103. *People v. Neal*, 31 Cal.4th 63, 1 Cal. Rptr.3d 650, 72 P.3d 280, 296 (2003) (Kennard, J., concurring).

ances were designed to impair Dorsey's ability to appreciate his rights and make a rational decision whether to assert them. Dorsey's repeated statements to Crespo, after he confessed, that he would "take the robbery" demonstrate how effectively Ross and Thompson persuaded Dorsey of the *quid pro quo* he would receive for abandoning his insistence on remaining silent.

When Crespo and Young took over on Sunday afternoon, they did nothing to remedy the violation and devaluation of Dorsey's rights. They did not re-advise Dorsey or tell him his rights would be respected if he changed his mind at any point and chose to terminate the questioning.[104] Nothing in the record supports a conclusion that Dorsey knew Crespo and Young would do what none of the other detectives had done before. Nor did Crespo and Young undertake to correct the misimpressions conveyed by Ross and Thompson (at least not until after Dorsey had finished confessing, at which time Crespo deflated Dorsey's expectations that the charges against him would be limited). Thus the record does not show that Dorsey understood he would not be penalized for exercising his rights or rewarded for

relinquishing them. Accordingly, we hold that the government has not met its burden; a knowing and intelligent waiver by Dorsey of his Fifth Amendment rights cannot be found on the present record.

### 2. Voluntariness

█ Although we have concluded that the record does not show a knowing and intelligent waiver, we still must consider whether Dorsey was coerced. This is because "an involuntary statement is inadmissible at trial for any purpose, [while] voluntary statements are admissible to impeach a defendant's trial testimony even if taken in violation of *Miranda's* [and *Edwards's*] prescriptions."[105]

█ "The test for determining the voluntariness of specific statements 'is whether, under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion.'"[106] We consider the question of voluntariness on the present record to be exceedingly close.[107] As we have discussed, the detectives' wrongful disregard of Dorsey's rights and persistent badgering were unquestionably coercive in nature.[108] In this

---

**104.** *Cf. Seibert,* 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment) ("Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.").

**105.** *United States v. Turner,* 761 A.2d 845, 853 (D.C.2000) (citations omitted). On the facts of this case, the inquiry with respect to the voluntariness of Dorsey's waiver is the same as it is with respect to the voluntariness of his confession. *Graham v. United States,* 950 A.2d 717, 735–36 & n. 68 (D.C.2008); *see also Colorado v. Connelly,* 479 U.S. 157, 169–70, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Thus, our discussion here applies equally to both issues.

**106.** *Turner,* 761 A.2d at 854 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

**107.** Our conclusion that Dorsey's request to speak again with the detectives must be viewed as a delayed response to their badgering does not necessarily mean it was involuntary. There is a difference between evoking a response from a suspect and compelling it.

**108.** We note that the several techniques employed by the detectives have drawn cogent criticism for their psychological coerciveness and their tendency to elicit false confessions from innocent suspects. *See generally* Nadia Soree, *When the Innocent Speak: False Confessions, Constitutional Safeguards, and the Role of Expert Testimony,* 32 Am. J.Crim. L. 191, 196–201 (2005); Steven A. Drizin &

regard, we deem particularly troubling the detectives' warnings to Dorsey that he would suffer adverse consequences if he insisted on consulting counsel and exercising his constitutional rights, their provision of dubious legal advice to sway Dorsey's judgment, and their suggestions as to what story Dorsey could tell to minimize the gravity of his crimes. Such overreaching tactics must be condemned. "[T]here are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor," [109] and law enforcement officers have *no* business encouraging a suspect to confess by feeding him fabricated facts to regurgitate.[110] Had Dorsey given in and confessed during the first round of his interrogation, we would find it impossible to conclude that he made a voluntary waiver or confession.

■ Dorsey did not give in and confess during the first round, however, and he then had a break lasting several hours, during which he rested and could reflect on his situation. His physical discomfort was alleviated, and when he said he was hungry, he was provided with something to eat. He admitted in his suppression hearing testimony that he did not feel intimidated when he was in his cell. We cannot ignore these facts entirely, though for the same reasons that we discounted their significance in discussing whether Dorsey made a valid initiation under *Edwards*, we can attach but minimal significance to them in evaluating the voluntariness of his waiver. It would be implausible to maintain that the temporary respite completely nullified the impact of the prior badgering, which was calculated to continue to work on Dorsey's mind; at most, the recess allowed the coercion to abate to some indeterminable extent.[111] By itself, this would not be enough to persuade us that the pressures on Dorsey to relinquish his constitutional rights were sufficiently dispelled—especially as our judicial duty is to "indulge every reasonable presumption" against his waiver of those rights.[112]

■ In addition, however, Judge Gardner made the finding that, after having had the opportunity to rest and reflect, Dorsey was overcome by genuine feelings

Richard A. Leo, *The Problem of False Confessions in the Post–DNA World*, 82 N.C. L.Rev. 891, 908–20 (2004); Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv. U.L.Rev. 979 (1997).

**109.** *United States v. Harrison*, 34 F.3d 886, 891–92 (9th Cir.1994) (emphasis in original).

**110.** Suggesting mitigating "facts" for the suspect to adopt as part of an admission of guilt has been termed "the accident scenario technique or the maximization/minimization strategy to deliver threats and promises." Ofshe & Leo, *supra* note 108, at 1088. The ploy is offensive at the most basic level because it appears to offer a benefit—leniency—in exchange for a false confession (a benefit, moreover, that the police have no power to grant). *See id.* at 1089. Ironically, "[b]ecause guilty suspects can often see through the tactic [and recognize it is a trap], it may generally be more effective when directed at the innocent." *Id.*

**111.** *Cf. Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir.1992) (reasoning that passage of some six hours between defendant's physical beating by police and his subsequent confession to other interrogators in another location constituted a "meaningful interlude" in which the threat of coercion "faded considerably," so that even though the "contamination" had not "completely disappeared," it was not enough given the "break in the stream of events" to render the confession involuntary).

**112.** *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) ("[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights." (internal quotation marks omitted)).

of remorse and that it was Dorsey's own contrition rather than the detectives' coercive inducements that motivated him to waive his rights and confess. The judge's determination of Dorsey's motivation is a finding of historical fact.[113] This finding is supported by substantial evidence in the record, notably Dorsey's repeated statements of repentance on the videotape of his confession, which he never disavowed or explained away in his testimony at the suppression hearing. Furthermore, Dorsey had withstood the detectives' prolonged badgering throughout the overnight interrogation,[114] and when he confessed, he did so calmly, agreeing that he had *not* been forced to do anything against his will.[115] We well appreciate that there is substantial evidence to the contrary and that a reasonable observer could doubt the sincerity of Dorsey's statements of remorse and dismiss them as just "the predictable harvest" of Ross and Thompson's interrogation strategy.[116] But as a review-

ing court, we "may not usurp the prerogative of the [trial] judge, as the trier of fact, to determine credibility and weigh the evidence."[117] The "clearly erroneous" standard of review is highly constraining; it "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is .... convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."[118] Indeed, we owe especial deference to Judge Gardner's determination that Dorsey was penitent when he chose to confess because the judge had the singular opportunity to take Dorsey's measure not only on the videotape, but also in person when he took the witness stand.[119] A judge may not, of course, "insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness."[120] But where, as here, "there are two permissible views of the evidence,

113. *See Morris v. United States*, 728 A.2d 1210, 1219–21 (D.C.1999) (holding it a factual determination committed to the trial judge that defendant was motivated to waive his right to counsel and confess by feelings of remorse).

114. *See Beasley v. United States*, 512 A.2d 1007, 1016 (D.C.1986) ("[A]ppellant's own behavior during the interrogation indicates that the officers' statements were not sufficient to coerce a ... confession.").

115. *See Plater v. United States*, 745 A.2d 953, 962 (D.C.2000) (affirming determination that waiver and confession were voluntary where, *inter alia*, the trial judge found that the defendant "expressed that he was not threatened and that he was not forced to give his statement" and that the defendant's "disposition appeared comfortable on the videotape").

116. *Collazo v. Estelle*, 940 F.2d 411, 423 (9th Cir.1991) (en banc).

117. *In re S.G.*, 581 A.2d 771, 775 (D.C.1990).

118. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

119. *See id.* at 575, 105 S.Ct. 1504 ("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."); *In re S.G.*, 581 A.2d at 774 ("The trial judge presided over the factfinding hearing and was able to observe and assess the demeanor of the witnesses. This court, on the other hand, is limited to a paper record which may capture the words of a case but not its heart and soul.").

120. *Anderson*, 470 U.S. at 575, 105 S.Ct. 1504. For example, "[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." *Id.*

the factfinder's choice between them cannot be clearly erroneous."[121] We may be skeptical, but we perforce must defer to Judge Gardner's factual determination.

That Dorsey was motivated by pangs of conscience weighs heavily against the contention that his will was overborne by the detectives' coercive tactics.[122] Even though Ross and Thompson may have aroused those pangs by their improper badgering (thereby invalidating Dorsey's "initiation" of further interrogation), their origin did not preclude Dorsey's eventual waiver and confession from being, ultimately, "the product of a free and deliberate choice rather than intimidation, coercion, or deception."[123] Considering the totality of the circumstances and the key findings of fact by the motions judge, we hold that the government met its burden of showing the voluntariness of Dorsey's waiver and confession. Accordingly, while the government will be precluded in a new trial from introducing Dorsey's confession against him in its case-in-chief, the confession will be admissible for purposes of impeaching Dorsey if he takes the stand.

## III. Conclusion

We have concluded that Dorsey's confession was obtained in violation of *Edwards* and *Miranda*. Because the trial court therefore erred in admitting the confession in the government's case-in-chief, we reverse Dorsey's convictions and remand this case with the direction that he be retried.

*So ordered.*[124]

Dissenting opinion by Associate Judge THOMPSON.

Dissenting opinion by Senior Judge REID.

THOMPSON, Associate Judge, dissenting:

Hours into his interrogation by police during the night of May 7–8, 2005, appellant Dorsey invoked his Fifth Amendment rights to counsel and to remain silent, in words as unambiguous as imaginable: "I want to talk—I need to talk to a lawyer now" and "I don't want to talk no more. I'm not saying nothing else." It is shocking, this many years after *Miranda*,[1] that,

---

**121.** *Id.* at 574, 105 S.Ct. 1504.

**122.** *See, e.g., Dickerson v. United States,* 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (" 'A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt ... but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape ... that no credit ought to be given to it; and therefore it is rejected.' ") (quoting *King v. Warickshall,* (1783) 168 Eng. Rep. 234 (K.B.) 235; 1 Leach 262, 263–264.).

**123.** *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

**124.** Dorsey's appeal raised a second issue, whether the trial court abused its discretion by not permitting him to present expert testimony at trial on techniques used by police to

elicit confessions and the phenomenon and psychology of false confessions. Our conclusion that Dorsey is entitled to a new trial at which the government will be precluded from introducing his confession in its case-in-chief renders it unnecessary for us to decide whether the trial court erred in excluding the proffered expert testimony. If the issue should arise at a new trial, we presume the trial court will consider the admissibility of the expert testimony in accordance with the criteria set forth in *Dyas v. United States,* 376 A.2d 827, 832 (D.C.1977).

**1.** *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.").

without missing a beat, the detective who heard him make those unequivocal statements continued questioning him and urging him to incriminate himself. Thereafter, for the rest of the night, Mr. Dorsey remained in the interrogation room, handcuffed to a chair, and detectives re-appeared to question him again in the morning, before he at last was taken to a holding cell, where he was able to lie down and get some sleep. There can be no dispute that Mr. Dorsey's *Miranda* rights were violated; as to that, there is no issue.[2]

What *is* in issue, of course, is whether Mr. Dorsey nevertheless was subject to the further questioning that occurred on the afternoon of May 8, 2005—when he confessed to assaulting and robbing street vendor Vassiliki Fotopoulous—on the ground that, after a several-hour break in the interrogation, he "initiated" that further conversation with the detectives within the meaning of the Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding that once an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police"). We must also decide whether, when Mr. Dorsey was questioned by the detectives on the afternoon of May 8, he validly waived the Fifth Amendment rights he had earlier invoked.

In his opinion for the majority of the en banc court, Judge Glickman has painstakingly summarized the Supreme Court jurisprudence that governs our attempt to resolve these issues. I agree with much of his skillful and elegant exposition. It is not at all clear to me, however, that *Edwards* and its progeny necessitate an elaborate analysis of whether an accused's reopening of a dialogue with police was a "true" initiation. I have in mind the expression of "doubt" by the plurality in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), that it would be "desirable to build a 'superstructure of legal refinements around the word "initiate."'" *Id.* at 1045, 103 S.Ct. 2830.[3] I

---

**2.** I recognize that the trial court found that Mr. Dorsey invoked his right to remain silent even earlier than when he made the statement I quote in the text above: when he told Detective Ross that he wanted to "go back there [the holding cell] to sleep. Take me back now[.]" The government no longer contests that ruling, and, for purposes of observing a line of demarcation between the detectives' "pre-invocation" and "post-invocation" interrogation of Mr. Dorsey, I accept the trial court's finding. I note, however, that I do not think Mr. Dorsey's statement that he wanted to be allowed to sleep was an unambiguous statement that he wished to cut off any further conversation with police. *See Berghuis v. Thompkins*, —— U.S. ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (holding that "an accused who wants to invoke his or her right to remain silent [must] do so unambiguously" and unequivocally); *cf. DeWeaver v. Runnels*, 556 F.3d 995, 1002 (9th Cir.2009) (holding that "[t]he state appellate court could properly conclude ... that a reasonable officer in the circumstances would not have understood" defendant's request to be "taken back to jail" to be "an invocation of the right to silence") (citing *Davis v. United States*, 512 U.S. 452, 459–61, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). There is a stark contrast between Dorsey's statement that he wanted to be taken to the holding cell to sleep and his unequivocal statement, 48 transcript pages later, "I don't want to talk no more. I'm not saying nothing else." *Cf. Berghuis*, 130 S.Ct. at 2260 ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police ..., so he did not invoke his right to remain silent.").

**3.** Certainly, the "initiation" envisioned by *Edwards* must come after a break in the interrogation. As one court has observed, *"Edwards* would be rendered meaningless if agents were permitted to continue interrogation after the

also am not persuaded that an elaborate analysis of whether there was a "true" initiation adds anything of value to the required analysis of whether a suspect's decision to countermand his previous invocation of his Fifth Amendment rights and to confess was made voluntarily (as well as knowingly and intelligently).[4] After all, the ultimate aim of *Edwards* is the suppression of "coerced confessions." *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045 (2010) ("[T]he benefits of the [*Edwards*] rule are measured by the number of coerced confessions it suppresses that otherwise would have been admitted.").[5] I believe Judge Reid's critique of the majority opinion is on target, and I join her dissenting opinion.

That said, the major impetus for my dissenting opinion is that I find myself

unable to agree with the majority's conclusions (1) that Mr. Dorsey's request to resume speaking with the detectives was "reasonably attributable" to the detectives' earlier improper interrogation and (2) that Mr. Dorsey did not knowingly and intelligently waive his *Miranda* rights.[6] For purposes of my analysis in this dissenting opinion, I will assume, despite the misgivings I have described, that, in order to meet its burden of showing that when Mr. Dorsey called out from his holding cell and said that he wanted "to tell what happened," he made a valid initiation of a further conversation with the detectives, the government must show that Mr. Dorsey's decision was in no way the delayed product of the earlier, improper post-invocation interrogation. The government also has the burden of establishing that when Mr. Dorsey spoke with detectives on the

---

request for counsel, and then claim that the consequent response by the accused represented initiation and permitted a waiver of the asserted counsel right." *United States v. Gomez*, 927 F.2d 1530, 1539 (11th Cir.1991) (concluding that the putative "initiation" was not a valid initiation since it came "no more than a few minutes" after the last question from police) (citation omitted); *see also Commonwealth v. Ferguson*, 278 Va. 118, 677 S.E.2d 45, 49 (2009) (holding that there had not been a "voluntary reinitiation of communication" but instead "one continuous custodial interrogation"). But *Edwards* suggests that "initiation" refers simply to a resumed exchange that was at the accused's "suggestion or request," and was not "at the instance of the authorities." *Edwards*, 451 U.S. at 487, 101 S.Ct. 1880.

4. *See Miranda*, 384 U.S. at 476, 86 S.Ct. 1602 ("[A]ny evidence that the accused was … cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."); *Beasley v. United States*, 512 A.2d 1007, 1016 (D.C.1986) (noting, as part of an analysis of voluntariness, the fact that the appellant "never claimed that he was influenced by the officers' statements about the allegedly incriminatory evidence they had uncovered").

5. There is, as the majority opinion states, "a difference between evoking a response and compelling it," *ante*, 1203 n. 107; but "we must remember the purpose behind [the] decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions." *Arizona v. Mauro*, 481 U.S. 520, 529–30, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

6. I agree with the majority's conclusion upholding the trial court's determination that Mr. Dorsey voluntarily waived his *Miranda* rights when he spoke to detectives on the afternoon of May 8 and confessed to assaulting and robbing Ms. Fotopoulous. The majority opinion reaches that conclusion out of deference to the trial court's finding, which it concludes (with "skeptic[ism]") was not clearly erroneous. For the reasons discussed in my concurring opinion in the now-vacated Division opinion in this case, *see Dorsey v. United States*, 2 A.3d 222, 234–39 (D.C.2010) (Thompson, J., concurring), and for many of the reasons discussed in this dissenting opinion, I would reach the conclusion that Mr. Dorsey voluntarily waived his rights even if our task were to make that determination in the first instance.

afternoon of May 8, he made a voluntary, knowing, and intelligent waiver of his rights.

In my view, the majority opinion has, in a "noble attempt to vindicate important legal principles, ... misinterpreted and exaggerated the essential and dispositive facts of this case." *Collazo v. Estelle*, 940 F.2d 411, 427 (9th Cir.1991) (en banc) (O'Scannlain, J., dissenting). In particular, as I explain below, the majority opinion fails to appreciate that the aspect of the improper interrogation that had a perceptible impact on Mr. Dorsey had abated before he told the detectives that he wanted to speak with them again and to confess. The opinion also ascribes unwarranted significance to the aspects of the improper interrogation to which Mr. Dorsey showed himself to be immune. In addition, the opinion sees linkages between Mr. Dorsey's confession and the improper interrogation which simply are not there—linkages which Mr. Dorsey's own statements belie.[7] Finally, the opinion fails to give due regard to the " 'particular facts and circumstances' " that are determinative of whether a valid waiver occurred, " 'including the background, experience, and conduct of the accused.' " *Edwards*, 451 U.S. at 482, 101 S.Ct. 1880.

## I.

I begin with a brief recap of the chronology of what occurred in this case and then a description of essential facts about Mr. Dorsey's background, experience, and conduct. Mr. Dorsey was held in the interrogation room, handcuffed to his chair (except when he was allowed to use the bathroom), for about thirteen hours. For most of that time—nine or ten hours—he was left alone in the room, but detectives questioned him at various points during the evening of May 7, during the wee hours of the morning of May 8, and just before he was allowed to go to a holding cell to rest at about 9:15 on the morning of May 8. During the entire time, Mr. Dorsey never incriminated himself; rather, he told the detectives repeatedly that he "didn't do nothing" and—over a dozen times—that he would just "go to court." Between 3:30 and 4:00 p.m. on May 8, which was about seven hours after he was taken to the holding cell where he was able to get some sleep, he called out and asked to talk to Detective Ross, saying that he wanted to "tell what happened." He was brought back to an interrogation room, where he admitted to Detective Crespo (whom Mr. Dorsey had seen in a hallway and asked to join the interview) and Sergeant James Young (who had not interrogated Mr. Dorsey earlier) that he assaulted and robbed Ms. Fotopoulous. The interrogation (including the many hours Mr. Dorsey spent alone in the interrogation room[8]) and the confession were videotaped in their entirety.

---

7. I am nearly alone in my observations, but so was the child who—though others lined up to approve the emperor's (invisible) new clothes and "carr[ied] high the train that wasn't even there"—exclaimed, "But he doesn't have anything on!" Hans Christian Andersen, *The Emperor's New Clothes*, in THE SNOW QUEEN AND OTHER TALES 72, 77 (Pat Shaw Iversen trans., The New American Library 1966) (a tale aptly retold in *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 173 n. 18 (3d Cir.2008), and *United States v. Harrington,* 947 F.2d 956, 963 (D.C.Cir.1991) (Edwards, C.J. concurring)).

8. I believe this must be regarded as part of the interrogation, inasmuch as the detectives' leaving Mr. Dorsey handcuffed to his chair there was "a measure of compulsion above and beyond that inherent in custody itself," and was action "that the police should [have] know[n][was] reasonably likely to elicit an incriminating response[.]" *Rhode Island v. Innis*, 446 U.S. 291, 300, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

The record includes a number of other essential facts. First, Mr. Dorsey was, as the trial court found, a "seasoned veteran" of criminal proceedings. As Mr. Dorsey agreed, his record showed that he had "been around the block a couple times." By the time of his interrogation in this case, he had at least ten prior convictions, had been arrested over thirty times before, and on other occasions had been questioned by police as a suspect but not charged. Although Mr. Dorsey told a detective at one point that the last time he went to jail was 1995, he also acknowledged that he had "been in jail lots of time," had been "locked up quite a bit," and had "been doing time ... a long time ... Years, trust me." [9] He had been convicted of a succession of serious crimes: prison breach, second-degree theft, unlawful entry, taking property without right, assault with a dangerous weapon, a Bail Reform Act violation, felony grand larceny, burglary, possession of burglary tools, and breaking into a dwelling with intent to steal. When asked to look at the PD–47 advice-of-rights card and to let Detective Ross know if he had "any problems" understanding it, Mr. Dorsey brushed off such a notion, saying, "No, I'm used to that." Mr. Dorsey was so familiar, it seems, even with the police location in which he was being held, that when Detective Ross said that he would allow Mr. Dorsey to go to the cellblock to get some rest, Mr. Dorsey asked whether he could "go to Central Cellblock." Mr. Dorsey agreed with Detective Ross that he (Mr. Dorsey) "kn[e]w the [police] districts ... probably better than half the cops out here."

Second, Mr. Dorsey was not intimidated by the detectives' questioning or by being in custody.[10] I am not sure how many of my colleagues have watched the entire thirteen-plus-hour video recording of what transpired in the interrogation room before Mr. Dorsey was taken to his holding cell; I believe that any who did not watch the entire recording have been deprived of an important part of the record, which shows, in a way the paper transcript cannot, the generally polite, conversational and relaxed tone of the exchanges between the detectives and Mr. Dorsey. The video recording also shows how impervious Mr. Dorsey appeared to be to the detectives' questioning and cajoling (denying over and over again that he had been in the Foggy Bottom area on the day of the robbery, that he still owned a green bicycle, that he carried a backpack, and that he wore a knit cap, and that he "robbed a old woman"). In addition, as even the written transcript makes clear, Mr. Dorsey skillfully parried the detectives' statements and questions by challenging the premises of what they said,[11] or, when they insisted that he was not telling the truth, lobbing his own accusations that they were lying.

When Detective Ross told Mr. Dorsey that he was "getting ready to go at [Mr. Dorsey] hard," Mr. Dorsey seemed undis-

9. Mr. Dorsey did not disagree when Detective Ross said to him, "I can't threaten you with that [i.e., being locked up]. You've been locked up most of your life."

10. At the outset, Mr. Dorsey matter-of-factly told Detective Ross that he had run from the police because he "had some drugs on him."

11. For example, when Detective Thompson told Mr. Dorsey that the police were going to pick up (i.e., arrest) his girlfriend, Mr. Dorsey asserted that the detective had no authority "to go across [to] another [police] district" to make an arrest. When Detective Ross expressed disbelief that Mr. Dorsey "never went to church with" his mother, Mr. Dorsey retorted, "How you know she a church woman?" He countered Detective Thompson's statement that "the court [would not] be as sympathetic as [the detectives]" with, "Trust me, I know. I've been there."

turbed, replying, "All right. Go ahead." Even thereafter, Mr. Dorsey's exchanges with the detectives included light-hearted banter. At one point, Mr. Dorsey and Detective Ross talked about Ross's needing a shoe shine ("Q: I could use shine right now, huh? Look at that. A: Yeah, you could use one.... You could save them."). At another point, Detective Ross and Mr. Dorsey exchanged a "fist bump" after the detective told Mr. Dorsey he would have to "give [the detective] some love" for the cleverness of one of the detective's questions, when Mr. Dorsey could not answer the question. And at still another point, Mr. Dorsey had an exchange with one of the officers about whether the officer could bring Mr. Dorsey champagne rather than water ("Q: Can I get some water? ... A: Just water? ... No champagne or nothing? A: Yeah, you got some? Q: Yeah, I can get you some.").

The ease Mr. Dorsey felt in the interrogation room continued in the holding cell (a place to which Mr. Dorsey repeatedly asked to be taken. He repeatedly urged the detectives to "[j]ust put me back there [i.e., in the cellblock] and we'll go to court. You know, I'm used to that.... I'm used to that anyway."). As Mr. Dorsey acknowledged during the suppression hearing, he was not "intimidated by being in a jail cell." He even observed that, having lost his belongings during a recent eviction, he didn't "mind going to jail" or "doing time."

Third, Mr. Dorsey was familiar with and cynical about police interrogation techniques. He observed at one point during the interrogation that Detective Ross, the lead detective, was "trying everything in the book," and he told the detective, "You're playing with me." As Detective

Ross goaded Mr. Dorsey to give a DNA sample, and Mr. Dorsey said repeatedly that he would do it if he had a lawyer, Mr. Dorsey explained that he would do so only under that condition because he had "seen police do a lot of crazy stuff[.]" Mr. Dorsey pronounced as "bullshit" Detective Ross's statement that he could prove that Mr. Dorsey robbed Ms. Fotopoulous through DNA. He told the detective that when he finally got to court, he would say, "Officer, you know what, you lied." And during the interview on the afternoon of May 8 when he confessed, Mr. Dorsey told the detectives that he knew his interrogators had been lying about the evidence they claimed to have against him (saying, "I know you all ain't have no case on me"). He referred again to "all that bullshit" the detectives had claimed to have, explaining, "I've been in the system and all. I know." At the suppression hearing, he agreed that what he meant by the foregoing statement was that he had "been in the system long enough that [he] didn't believe what the police had been telling [him] the night before."

Fourth, the video recordings make clear that the aspect of the custodial interrogation that caused Mr. Dorsey discomfort was not the persistent questioning itself, or the detectives' claims about the evidence they were building against him, but his inability to lie down to sleep.[12] Mr. Dorsey pleaded with the detectives to be taken down to the cellblock, saying—by my count, at least twenty times—some variation of "I just want to lay, I just want to lay down. I want to lay down" or "I'm ready to go to sleep." During the several hours when Mr. Dorsey was left alone in the interrogation room, he sometimes maneuvered to the floor and lay down there,

12. The transcript indicates that, at times, Mr. Dorsey was sweating and shaking while he was in the interrogation room. He attributed these symptoms to his "need[ing] a drink," adding "I didn't get my drink today."

arm raised and still handcuffed to the chair in which he had been sitting. As I have observed previously, his discomfort at those times, and as he tried to sleep while sitting up in an unforgiving chair, is palpable. Notwithstanding, Mr. Dorsey never wavered from his claim of innocence before he was finally allowed to go to the holding cell to get some rest.

## II.

Upon the record I have described, my colleagues in the majority posit that "[i]t would be implausible to maintain that the temporary respite in his holding cell nullified the impact of the improper post-invocation interrogation." Quite to the contrary, what I think the video recordings and the entire record make clear is that the only perceptible impact of the improper post-invocation interrogation on Mr.

Dorsey was the extreme discomfort of being unable to lie down and sleep. That discomfort, which did not bring him to the point of confessing, had abated by the time Mr. Dorsey called out to detectives to arrange the interview in which he confessed. A rested and visibly refreshed Mr. Dorsey sat down with detectives for that interview. My colleagues in the majority cite the "common-sense premise ... that the pressures of custodial interrogation only *'increase* as custody is prolonged.'" *Ante,* 1198 (quoting *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990)).[13] But reliance on that generalization in this case simply ignores the record. The record here shows that the real coercive pressure of interrogation subsided once Mr. Dorsey was returned to a holding cell and allowed to recline and sleep.[14]

**13.** Citing *Maryland v. Shatzer,* 559 U.S. 98, 130 S.Ct. 1213, 1222–23, 175 L.Ed.2d 1045 (2010) (adopting a bright-line rule that two weeks must pass following a suspect's release from custody before the *Edwards* presumption of involuntariness expires and police may seek to interrogate the suspect after he asked for counsel), my colleagues also say that "[i]f the coercive effects of custodial interrogation are so profound that it takes two weeks in the community for them to dissipate even in the absence of police badgering, a few hours alone in a holding cell cannot be considered enough time for a suspect to 'shake off' egregious badgering of the sort exhibited here." *Ante,* 1198 n. 80. However, the Supreme Court fashioned the "unusual" rule in *Shatzer* because "officers need to know, with certainty and beforehand," when *they* may lawfully initiate renewed interrogation. *Shatzer,* 130 S.Ct. at 1222–23. I see no implication in *Schatzer* that any precise time period must elapse before the *suspect* may initiate a renewed conversation. Nor is there a reason for such a rule where (as the trial court found here and the majority accepts) the suspect made a voluntary waiver of his rights, and where, by the suspect's own admission, the holding cell where he rested for several hours before deciding to resume speaking with police was a familiar and non-intimidating loca-

tion. *Cf. Henderson v. Singletary,* 968 F.2d 1070, 1073–74 (11th Cir.1992) ("We note that for a significant period following a request to cut off questioning, ... the police are barred from interrogating a suspect. However, we do not believe the same time standard necessarily applies to a situation in which the police discontinue questioning and the defendant subsequently initiates a confession. The significant period standard was developed for situations in which the police are asked to stop questioning and then resume questioning. It does not make sense to apply the same time standard to situations in which the defendant controls the time period between the end of police questioning and the start of a defendant-initiated confession.") (internal quotation marks, footnote, and alterations omitted).

**14.** It might be argued, I suppose, that it was the memory of being handcuffed to a chair all night and prevented from lying down comfortably that brought Mr. Dorsey to the brink of confession. But I would find that argument entirely unpersuasive, since Mr. Dorsey called out to the detectives to say that he wanted to tell them what happened when nightfall was still many hours away; it seems that if he had been motivated by a desire to

Relying on another generalization, the majority opinion declares that "[i]n the few hours Dorsey was given to sit and stew in his cell, he continued to be 'cut off from his normal life and companions, thrust into and isolated in an unfamiliar, police-dominated atmosphere.'" *Ante*, 1198 (quoting *Shatzer*, 130 S.Ct. at 1220). That language no doubt accurately portrays the circumstances facing many accused individuals who have been taken into police custody, but it surely exaggerates Mr. Dorsey's situation. As the discussion above shows, the police-dominated atmosphere in which Mr. Dorsey was held and questioned was not unfamiliar to him. It was, to the contrary, one part of his normal life; he was, as he said, "used to that."[15] While in the holding cell, Mr. Dorsey had time for "further deliberation in familiar surroundings." *Shatzer*, 130 S.Ct. at 1221.

In the principal thrust of their effort to explain their conclusion that Mr. Dorsey's decision to resume speaking with the detectives was a product of the improper interrogation, my colleagues in the majority purport to discern in Mr. Dorsey's confession the influence of the themes the detectives had pursued in their post-invocation exchanges with him. They cite Mr. Dorsey's remark, "If that would have happened to my mother, man"; his statement that he was "a little tipsy nipsy like, you know, drinking" at the time of the robbery;

his statement that he felt "bad" about hitting Ms. Fotopoulous and his explanation that he "might as well ... just get it off [his] chest"; and his comment that he would "take the robbery" but did not want "no whole lot of extra charges." They trace these statements to Detective Thompson's post-invocation references to Mr. Dorsey's mother and Mother's Day and to whether Mr. Dorsey's mother had ever been robbed; to Detective's Thompson's suggestion that Mr. Dorsey should take the opportunity to explain that he was drinking or on drugs when he committed the robbery; to the detectives' urging Mr. Dorsey to "show remorse"; to Detective Thompson's comment that "[a]ny decent person would want to get this off [his] chest"; to Detective Thompson's advice that Mr. Dorsey should confess to police so as to "minimize" the charge against him to "straight robbery," rather than go to court, where all the evidence would be "stacked up against [him]"; and to Detective Ross's statement on the morning of May 8 that prosecutors would "up the charges" if Mr. Dorsey did not tell the truth.

Our case law heretofore has taken the approach that we need not "totally eliminate the possibility" that something police officers improperly said or did, after a suspect invoked his *Miranda* rights, remained in his memory when he decided to

avoid spending another full night in the interrogation room, he would have waited until nightfall approached again, when that possibility was upon him.

15. Moreover, the police-dominated atmosphere included the presence. of Detective Crespo, an officer whom Mr. Dorsey had known for about ten years, with whom he acknowledged he had a relationship of mutual respect, who Mr. Dorsey agreed had never lied to him in the ten years he had known him, who used to come "all the time" to the area where Mr. Dorsey worked shining shoes, who saw Mr. Dorsey three or four times a

week over a five- or six-year period when Detective Crespo worked in the area where Mr. Dorsey "hung out," and who sometimes gave Mr. Dorsey used clothing, tolerated his panhandling, and moved him away from an angry crowd at the time of his arrest. There is no denying that Detective Crespo was not on Mr. Dorsey's side; like the other detectives, he was urging Mr. Dorsey to confess, and—needless to say—he was no substitute for counsel. But my point here is simply that Mr. Dorsey was not entirely cut off from familiar and trusted people.

resume speaking with police. *See Riley v. United States,* 923 A.2d 868, 884 n. 17 (D.C.2007). But even on the assumption that we are obligated to attempt such "metaphysical unscrambling,"[16] what the majority opinion does not consider is that even *before* Mr. Dorsey invoked his *Miranda* rights, the detectives had already taken the same approaches to try to convince Mr. Dorsey to confess. Prior to Mr. Dorsey's invocation of his rights, Detective Ross mentioned to him that the next day was Mother's Day, said, "You wouldn't want to see anything happen to your mother, would you?" and added, "So don't you think [Ms. Fotopoulous was] somebody's mother?" Prior to Mr. Dorsey's invocation of his rights, Detective Ross also suggested that Mr. Dorsey blame his conduct on substance abuse, saying, "I think you were out of control because of some drugs." Prior to Mr. Dorsey's invocation of his rights, Detective Ross asked Mr. Dorsey whether he "really want[ed] to go into a courtroom—facing what you got over here—and roll the dice" with what would be presented there. My colleagues do not explain why—on the dubious assumption that these interrogation techniques had any effect at all on the veteran Mr. Dorsey—we should assume that it was the improper post-invocation efforts, rather than the almost identical post-invocation efforts, that had that effect. This omission is particularly critical since, during the post-invocation interrogation, Mr. Dorsey said that he was "tired as shit" and that his attention and focus were not on the detectives' recitations and needling, but on his need for sleep and physical comfort. (Q: "Something on your mind? A: Yeah, sleep."). Indeed, as the interrogation

wore on, Mr. Dorsey was barely listening to Detective Thompson's entreaties; his only reply to Detective Thompson's statement that he should "[d]o the right thing" by confessing was the non-sequitur, "Wasn't he [Detective Ross] supposed to bring me some [paper] shoes[?]"

Moreover, early during the May 7 interrogation, Mr. Dorsey told the detectives repeatedly that he was an alcoholic and that he drank "every day" (an explanation he repeated verbatim during his confession). For that reason, his statement during his confession that he had been drinking the day of the robbery therefore cannot reasonably be thought to demonstrate that his decision to speak to the detectives was the product of post-invocation interrogation. Notably, nowhere in his confession did Mr. Dorsey claim to have been under the influence of drugs or in need of drug treatment on the day of the robbery, as the detectives had suggested he might do.[17] And, rather than claim, as Detective Thompson had suggested, that he was not in his "right mind" on the day of the robbery, Mr. Dorsey focused on the fact that he simply did not know that Ms. Fotopoulous was "that old" when he acted. During the confession, the detectives asked Mr. Dorsey whether he knew then how old Ms. Fotopoulous was. Mr. Dorsey responded, "80s or something," but—importantly—I do not see in the transcripts or hear in the videotaped recordings that the detectives ever gave Mr. Dorsey that information.

It is true that Mr. Dorsey answered "Yeah" when detectives asked him, during the interview on the afternoon of May 8,

---

16. *Collazo v. Estelle,* 940 F.2d 411, 427 (9th Cir.1991) (Kozinski, I., concurring).

17. He did not do so even though he had told the detectives that he ran from police because

he had drugs on him, said that he used marijuana, and appeared to agree with detective Ross that he had "a drug problem a little bit."

whether he felt remorseful (although he never used the word "remorse" himself), and he said he felt "bad" when detectives asked, "How do you feel about what happened?"[18] But he also told Detective Crespo that he already "felt bad after I done it, you know, before, you know";[19] i.e., Mr. Dorsey regretted his actions even before the detectives urged him to "show" remorse. In saying that he "might as well just ... get it off [his] chest," Mr. Dorsey did use the common expression that Detective Thompson had used.[20] But even accepting the *post hoc ergo propter hoc* assumption that Mr. Dorsey was parroting Detective Thompson's expression, on this record, I believe that if Mr. Dorsey's decision to confess to obtain such relief can be traced to the interrogation, it is most reasonably attributable to the respected Detective Crespo's (pre-invocation) words. Detective Crespo had urged that, for Mr. Dorsey "to try to feel better about what's probably going on in [his] head," he should talk to Detective Crespo ("if there's somebody you're going to talk to, I hope it would be me") or to Detective Ross (who, Crespo said, was a "good man," for whom Crespo could "vouch"). It is telling that

when Mr. Dorsey called out and said that he wanted to tell what happened, he specifically asked for Detective Ross, and then called out to Detective Crespo to say that he wanted to confess.

Detectives Crespo and Young specifically asked Mr. Dorsey why he decided to tell them what happened ("What actually brought you to the point where you wanted to, to tell us what actually happened now?"). Mr. Dorsey responded, "I was just sitting in that cell thinking about what I did,"[21] and then uttered the words "go to jail" and "I'll probably never get out again," followed by, "I might as well just go on and come clean with you, you know, just get it off my chest." Thus, Mr. Dorsey's explanation for why he decided to speak to the detectives and tell them what happened was that he had time for reflection on the wrong he had committed. And, in linking his statement about "go[ing] to jail" and "probably never get[ting] out again" with his statement that he "might as well just ... get it off my chest," Mr. Dorsey seemed to say that, having reflected on the probability of a very long prison sentence, he decided he had nothing to lose from choosing the re-

18. He said that he had "never ever hit a woman," wasn't "used to it," didn't know that she was "that old," and had meant only to rob Ms. Fotopoulous, not to hit her. He never did express remorse for the robbery—except insofar as his statements that the robbery was "real stupid" and that he didn't need to rob anyone because he was working (audible on the tape, but not transcribed) could be said to be expressions of remorse.

19. The transcript indicates that, immediately before saying this, Mr. Dorsey said the converse, "I ain't feel bad after I done it." On the recording, however, he can clearly be heard to say, "I even feel bad after I done it."

20. Detective Thompson also used the common expression "get it off your chest" when suggesting that jail time would give Mr. Dorsey an opportunity to get his "medical stuff

squared away" and "off [his] chest." Mr. Dorsey did not make any reference to that opportunity during his confession.

21. Although the transcript indicates that Mr. Dorsey's initial words that preceded the foregoing were, "I don't want to sit in a cell for three (indiscernible)," I have listened to this portion of the recording many times, and I believe this is how Mr. Dorsey actually began his response to the question about what brought him to the point where he wanted to confess. (Should anyone object that the transcript must control, I remind them that the majority opinion states that Mr. Dorsey told Detective Crespo at one point that he " 'probably' could have beaten the charge in court," *ante,* 1188, but the transcript of what Mr. Dorsey said at that point reads only, "I could probably (indiscernible).")

lief of "getting it off his chest." Importantly, a very long prison sentence was something Mr. Dorsey, not the detectives, had predicted. During the interrogation, Mr. Dorsey commented that because he is a black man ("I'm black, you know") and the victim was a "white lady," he was going to get a sentence of "70, 80 years anyway," whether he confessed or went to court and lost, so "what the hell" and "if I lose, I lose." Detective Thompson had responded, "I'm not saying you're going to get 70, 80 years . . . you said that."

Mr. Dorsey's own statements also provide a sufficient reason to reject the reasoning that his decision to initiate a further conversation with the detectives was the product of Detective Thompson's post-invocation advice that he should "minimize" his situation by admitting to "straight robbery." Far from "minimizing" so that "all that shit would not have to be shown" (as Detective Thompson had urged), Mr. Dorsey's confession included a detailed account and a demonstration of how he pushed, hit and kicked Ms. Fotopoulous and held her down. Moreover, Mr. Dorsey acknowledged during the May 8 interview that he knew the detectives were "not in charge of what happens to [him]" and that it was not their job to "determine what happens to [him]." [22]

Nor is there any basis for thinking that Mr. Dorsey decided to resume talking to the detectives because of their claims, during the improper interrogation, to have compiled additional incriminating evidence against him.[23] He had accused his interrogators of lying, expressing that he knew from experience that the police often fabricate to try to obtain confessions, and he told the detectives to whom he confessed that he knew "you all ain't have no case on me." Further, he told Detective Crespo, "I know y'all ain't have shit on me.[24] I just wanted to get it off my chest anyway. . . . [A]ll that bullshit. . . . I've been in the system and all. I know." Of course, quite apart from the case the detectives said they were building, Mr. Dorsey knew, both from his pre-arrest discussion with his employer (who said, "[Y]ou know your picture [is] on the TV?") and others and from his pre-invocation discussion with Detective Crespo, that people who knew Mr. Dorsey and had seen the surveillance videotape of the robbery—which Mr. Dorsey understood was "all over T.V."—thought that the assailant shown on the tape was Mr. Dorsey. Upon Mr. Dorsey's having time for reflection, that knowledge no doubt informed his view, that he might as well confess since he was likely to spend a long time in jail anyway.

In short, especially when viewed in the light most favorable to sustaining the trial court's denial of Mr. Dorsey's suppression motion, the record provides no substantial basis for attributing Mr. Dorsey's decision to resume speaking with the detectives to the improper interrogation rather than to the reasons Mr. Dorsey himself described,

---

**22.** The majority opinion correctly notes that, in warning Mr. Dorsey that "prosecutors would 'up the charges' if he did not confess," Detective Ross "invok[ed] both his and Dorsey's experience with the criminal justice system." *Ante*, 1198. I fail to see how, having acknowledged that Mr. Dorsey's own (ample) experience made him believe that this was a possibility, the opinion can conclude that Mr. Dorsey was reacting to the detective's statement if he thought confessing might enable him to avoid a "whole lot of extra charges."

**23.** I also find it implausible that, during the time he spent in the holding cell, Mr. Dorsey "was brooding [ ] about how much worse off he would be with a lawyer than without one." *Collazo*, 940 F.2d at 434 (Goodwin, J., dissenting).

**24.** This is another sentence that is not in the transcript, but it can be heard clearly on the videotape.

and no basis for declining to recognize Mr. Dorsey's statement that he wanted to "tell [the detectives] what happened" as a valid initiation under *Edwards*.[25]

## III.

Nor does the record support any reasonable doubt that Mr. Dorsey knowingly and intelligently waived his rights to remain silent and to be questioned only with counsel present. The jumping-off point for the majority opinion's discussion of the knowing-and-intelligent-waiver issue is the statement that for there to be such a waiver, "the suspect must have been 'aware

that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation,' " *ante*, 1191 (quoting *Berghuis*, 130 S.Ct. at 2262), and must have known that his *Miranda* rights could " 'be invoked at any time.' " *Ante*, 1191 (quoting *Berghuis*, 130 S.Ct. at 2264).[26] The majority opinion suggests that Mr. Dorsey could not have had this knowledge because, when he invoked his rights to counsel and to remain silent, the detectives ignored him and continued the interrogation. I disagree. As I ex-

---

**25.** My colleagues in the majority say that they believe that "a *per se* rule barring the government from ever showing a valid initiation following improper police questioning of a suspect in custody after a request for counsel"—what might be called a "third layer of prophylaxis," *Davis*, 512 U.S. at 462, 114 S.Ct. 2350—"would be overly broad[.]" *Ante*, 1195. But, if a valid initiation (and, as I discuss below, a knowing and intelligent waiver) cannot be shown on the facts of this case, then I fear we have gone "a long way toward establishing the proposition that police misconduct creates a per se violation ... that subsequent voluntary acts of the accused can never render harmless." *Collazo*, 940 F.2d at 433 (O'Scannlain, J., dissenting). I agree that a *per se* rule is not warranted, because its effect would be to "imprison a [suspect] in his privileges," *Montejo v. Louisiana*, 556 U.S. 778, 788, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009) (internal quotation marks omitted), and because it would impose "substantial costs to the truth-seeking process and the criminal justice system." *Id.* at 797, 129 S.Ct. 2079. Still, I think the benefit of a bright-line test (avoiding fact-intensive inquiries) would be preferable to the majority's "cause-and-effect presumption" approach, *ante*, 1195, which assumes an "impact of the violation" despite all evidence to the contrary, and then requires a conclusion that the accused's decision to speak again with the police was the fruit of the improper interrogation if the necessary fact-intensive review suggests even a barely "plausible" linkage between the improper interrogation and the words of the confession. *Ante*, 1195–96.

**26.** The context of these statements in *Berghuis* shows that the Court was satisfied that this knowledge was supplied in the case before it merely by the suspect's having heard read to him a rights card that contained that advice. The opinion states:

> There was more than enough evidence in the record to conclude that Thompkins understood his Miranda rights. Thompkins received a written copy of the *Miranda* warnings; Detective Helgert determined that Thompkins could read and understand English; and Thompkins was given time to read the warnings. Thompkins, furthermore, read aloud the fifth warning, which stated that "you have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned." ... He was thus aware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation. Those rights, the warning made clear, could be asserted at any time. Helgert, moreover, read the warnings aloud.

130 S. Ct. at 2262. I believe that the record in this case does not disclose the language of the advice-of-rights card that Mr. Dorsey signed, but it does provide ample other evidence that Mr. Dorsey, too, understood that his right to remain silent and to have counsel did not dissipate.

plain below, even viewed with adherence to our judicial duty to "indulge every reasonable presumption" against a suspect's waiver of his rights, *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the record amply establishes that Mr. Dorsey had the requisite comprehension and knowledge.

To begin with, the record shows that Mr. Dorsey understood he could request a lawyer even after he had signed the PD–47 advice-of-rights card waiving his rights to remain silent and to be interrogated only with counsel present. When—sixty-four pages into the transcript of the interrogation—Detective Ross asked Mr. Dorsey whether he would be "willing to take a polygraph," he answered, "If I got a lawyer, yeah," and he agreed with Detective Ross that he was "putting caveats on things now." Later, when Detective Ross raised the issue of whether Mr. Dorsey would be willing to give a DNA sample, Mr. Dorsey repeated, "Like I said, if I get a lawyer ... I wouldn't mind doing it." Mr. Dorsey added that he had "to make sure" that (in Detective Ross's words) his "rights [we]re protected." Thus, by his conduct, Mr. Dorsey demonstrated that he had a practical understanding that he had a right to demand the presence of counsel. To suggest, as the majority opinion does, that he might have understood that right only in the abstract is to ignore the record.

Further, Detective Ross expressly confirmed to Mr. Dorsey that Mr. Dorsey had a right to demand counsel and to bring the interrogation to an end. At one point, after Detective Ross had stepped out of the interrogation room for a time and then returned, he asked Mr. Dorsey whether he was "willing to still talk to me? You're not saying—that you need a lawyer to talk to me, are you?" Mr. Dorsey answered, "No." Detective Ross continued, "If you're saying you want a lawyer, I'll stop right now, I'll walk out the door."[27] This is significant, since it was Detective Ross for whom Mr. Dorsey asked when he called out to say that he wanted to tell what happened. Detective Ross had acknowledged Mr. Dorsey's rights, and, as noted earlier, Detective Crespo had told Mr. Dorsey that Detective Ross was a "good man." I recognize that Detective Ross kept questioning Mr. Dorsey after Mr. Dorsey asked to be taken back to the holding cell "now," a statement the trial court found was an invocation of his right to remain silent; that Detective Ross questioned Mr. Dorsey on the morning of May 8, hours after Mr. Dorsey had told Detective Thompson (with whom he was then alone in the interrogation room) that he "need[ed] to talk to a lawyer now"; and that Detective Ross is charged with that violation of Mr. Dorsey's *Miranda* rights, even though he testified that he was not aware that Mr. Dorsey had invoked his right to counsel. But, as I explained in note 2 *supra*, I do not regard Mr. Dorsey's statement about being taken to the holding cell as an unambiguous invocation of his right to remain silent, and I see no reason to think that either Mr. Dorsey or Detective Ross so regarded it. In addition, Mr. Dorsey was aware that Detective Ross was not present when he invoked his right to counsel at about 3:00 a.m.[28] The critical point is whether Mr. Dorsey would have seen Detective Ross as someone who ac-

---

**27.** Thus, I cannot agree with my colleagues in the majority that Detective Ross "communicated to Dorsey that ... any attempts on his part to exercise his *Miranda* rights would be ignored." *Ante*, 1202.

**28.** Detective Ross had left the interview room shortly after 2:00 a.m., telling Mr. Dorsey that it was "time for you to get some rest."

knowledged his rights,[29] and I am persuaded that he did so regard Detective Ross, and that this is why he asked to speak with Detective Ross when he decided to confess.

Detective Thompson, by contrast, exhibited no regard for Mr. Dorsey's *Miranda* rights. But—and here is where the "background, experience, and conduct of the accused" come critically into play—Mr. Dorsey was a "seasoned veteran" of the criminal justice system, and he had "seen police do a lot of crazy stuff[.]" I find it entirely implausible that Mr. Dorsey's demonstrated, practical understanding of his *Miranda* rights evaporated because of his experience after Detective Thompson took over the interrogation. Indeed, immediately after declaring that he was "not saying nothing else," Mr. Dorsey uttered that he "should of just got a lawyer" rather than have brooked the detectives' questioning.[30] He thus demonstrated that he knew he had that right, even though Detective Thompson did not immediately honor it. He also thereby evidenced "a full awareness of both the nature of the right [he had earlier] abandoned and the consequences of the decision to abandon it." *Berghuis*, 130 S.Ct. at 2260 (internal quotation marks omitted).

In addition, in his testimony at the suppression hearing, Mr. Dorsey acknowledged that he understood that his right not to speak with the detectives continued. He agreed that he "understood [he] didn't need to talk to Investigator Crespo." Understanding that, there is no reason to think that he failed to understand that he "didn't need to talk" to any of the detectives; talking to the detectives was, rather, "a choice that [he] made." The majority opinion does not explain why we should not take Mr. Dorsey at his word.[31]

My colleagues in the majority say that "the record does not show that Dorsey understood he would not be penalized for exercising his rights or rewarded for relinquishing them." *Ante*, 1203. I believe it shows precisely that. First, it is reasonable to infer that Mr. Dorsey did not fear a penalty for exercising his rights because he invoked his rights, repeatedly. Second, as already discussed, during the interview in which he confessed, Mr. Dorsey acknowledged that he knew the detectives had no power over how he was charged. Third, as already described, Mr. Dorsey's expressed belief was that as a black man accused of robbing a white woman, a se-

**29.** This follows from the principle that *"Edwards* focuses on the state of mind of the suspect[.]" *Arizona v. Roberson*, 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

**30.** Undeniably, Mr. Dorsey's invocation of rights did not bring the immediate cessation of interrogation to which he was entitled, but I do not think it fair to surmise that Mr. Dorsey would have felt that he "futilely invoked" his rights. *Ante*, 1200. The transcript of the interrogation before Mr. Dorsey invoked his right to counsel covers 170 pages; after Mr. Dorsey invoked his right to counsel, Detective Thompson continued his questioning for only another seven pages, and he continued the questioning for less than one transcript page after Mr. Dorsey said unam-

biguously that he did not "want to talk no more" and was "not saying nothing else." Thereafter, he left Mr. Dorsey alone in the interrogation room until morning. Detective Thompson's failure to stop the interrogation right away was reprehensible conduct to be sure, but I suspect the sequence I have just described communicated to Mr. Dorsey that he did have the power to bring the questioning to adjournment.

**31.** The trial judge stated that he did not "believe one word of what [Mr. Dorsey] said on this witness stand," but he clarified that he meant that he did not "believe one word he said up there where there is a material difference in what he said and what the[ ] officers testified to."

vere penalty was inevitable, whether he spoke and admitted to the crime, or not (he expected "70, 80 years anyway, so what the hell.... "[I]f I lose, I lose. I ain't getting out anyway, so what the hell.").[32] Although Mr. Dorsey's belief (not to mention the racial history that no doubt engendered it) is lamentable, his expressed belief is perhaps the best evidence there can be that he was not under any illusion that he would be rewarded for relinquishing his rights. In my view, it is only by exalting generalizations over the record that my colleagues can conclude that Mr. Dorsey did not comprehend his rights.[33]

The majority opinion also focuses on the facts that Detectives Crespo and Young did not re-advise him of his rights or obtain another express waiver of his rights before interviewing him. This omission, they say, weighs against a finding that he knowingly and intelligently waived his rights. *Ante*, 1202–03. The majority opinion states further that "even if the suspect, after having terminated the interrogation by invoking his right to counsel, later chooses to initiate further discussion about the criminal investigation, the police must obtain 'a valid waiver of the right to counsel and the right to silence' before resuming the interrogation." *Ante* 1192 (quoting *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. 1880). It asserts in addition that the detectives' "not re-advis[ing] him or obtain[ing] an explicit waiver from him before they resumed his interrogation" was "[o]n its face ... [an] omission [that] was in contravention of *Edwards*." *Ante*, 1199. However, *Edwards* does not say that police must "obtain" a valid waiver (in the sense that they must re-advise the suspect of his rights and get him to write or say again that he is waiving them); rather, *Edwards* establishes, a waiver must have "occurred." *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. 1880. It is clear that "when an accused has invoked his right to have counsel present during custodial interroga-

---

**32.** As to Detective Ross's suggestion about the prosecutors "up[ping] the charges," he said that this would likely happen if Mr. Dorsey did not "tell the truth," *not* that it would happen if Mr. Dorsey chose to remain silent or to speak only with an attorney present. Detective Ross made the statement at a point when Mr. Dorsey was speaking to the detectives and continuing to insist that he "didn't do nothing." (Thus, the proposition that "there are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the *right to remain silent* may result in harsher treatment by a court or prosecutor," *United States v. Harrison*, 34 F.3d 886, 891–92 (9th Cir.1994) (italics added), quoted *ante*, 1204, is not really apropos.) To be sure, the statement came after Mr. Dorsey demanded to be taken back to the holding cell, in words that the trial court found constituted an invocation of his right to remain silent, and after Mr. Dorsey told Detective Thompson (when Detective Ross was absent) that he wanted a lawyer and would say nothing else, so there can be no dispute that the statement constituted improper interrogation. (Note, though, that Detective Ross made essentially the same statement pre-invocation, telling Mr. Dorsey that he was going to court "one way or another" and that "[t]he question is, how much time we want, a little bit or a lot?") But, in light of the context discussed in note 2 and in the text accompanying notes 27 and 28 *supra*, I do not think it is reasonable to assume that Mr. Dorsey would have perceived Detective Ross's statement as implying that he would face extra charges if he stood on his rights to remain silent and to have counsel present. Mr. Dorsey's comments to Detective Crespo about not wanting "a whole lot of extra charges" strike me as a request that the Detective let the government know about his cooperation. *Cf. Harrison*, 34 F.3d at 891 ("We have held that the police generally may offer to tell the prosecutor about the defendant's cooperation").

**33.** I find myself in agreement again with Circuit Judge O'Scannlain: "Courts must be wary of exaggerating what are properly recognized as contemptible improprieties into grandiose visions of injustice." *Collazo*, 940 F.2d at 433 (O'Scannlain, J., dissenting).

tion, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation[.]". *Id.* at 484, 101 S.Ct. 1880. Nevertheless, as the majority opinion acknowledges, "waivers can be established even absent formal or express statements of waiver." *Berghuis,* 130 S.Ct. at 2261.[34]

I frankly do not know what a rote, repeat citation of the *Miranda* rights, and a repeat expression of "I waive," would have added in the circumstances here: a veteran of the criminal justice system, who demonstrably understood that he was entitled to have a lawyer present during interrogation if he wanted one and to employ that "caveat" at any time, who expressly understood that he did not need to talk to the detectives, who withstood his previous, lengthy interrogation without intimidation and without making any inculpatory statement, and who also was not intimidated by his time in the holding cell. I am satisfied that an implied waiver occurred when Mr. Dorsey—who had previously been advised of the *Miranda* rights that he was "used to"—called out, told the detectives he wanted to tell them what happened, and then confessed. For that and all the foregoing reasons, I would hold that the trial court did not err in denying Mr. Dorsey's motion to suppress his confession. Because the majority opinion concludes to the contrary, I respectfully dissent.

REID, Senior Judge, dissenting:

Precedent in Fifth and Sixth Amendment jurisprudence reflects the need for a reasonable and delicate balance of competing considerations: (1) fundamental procedural rights accorded to criminal suspects; (2) deterrence against odious police tactics that exploit the vulnerabilities of criminal suspects and result in coerced confessions; (3) the right of criminal suspects to initiate conversation with police for the purpose of voluntarily confessing their crimes to law enforcement officers; and (4) the right of individual citizens and their communities to be free from and protected against heinous crimes that bring suffering and death to victims and anguish and grief to their loved ones. Regrettably, from my judicial perspective, the majority opinion in this case creates an unnecessary imbalance in these considerations by expanding existing prophylactic rules and creating a new prophylactic rule which is unjustified on this record.

The new prophylactic rule, however, eviscerates the possibility of the suspect's voluntary initiation of a conversation with police officers after a break in impermissible interrogation and an opportunity to rest and sleep away from the pressures of the interrogation room. The majority reverses the conviction of a veteran criminal defendant with ten prior convictions who, after a break in impermissible interrogation and an opportunity for sleep and reflection away from interrogators, voluntarily took full responsibility for his violent criminal acts that sent a limited English-speaking female vendor in her eighth decade to the hospital with a swollen face and eyes and bloody nose and mouth. His acts left the victim, her loved ones and the citizens of her community feeling unprotected and vulnerable. Moreover, the reversal of his conviction now forces the government to choose between letting Mr.

---

34. *See also Berghuis,* 130 S.Ct. at 2262 (noting that *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish [his *Miranda*] rights" and that, "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.").

Dorsey go free, or using its limited resources to retry him in 2013, without his confession as substantive evidence, for a crime committed in May 2005. I simply cannot agree that the new prophylactic rule is a justified expansion of the prophylactic rules adopted by *Miranda* and *Edwards*.

The majority articulates the following goals: (1) "clarify the requirements for finding a valid initiation and waiver"; and (2) determine "whether those requirements were satisfied here despite the *Miranda* and *Edwards* violations in the interrogation that preceded [Mr.] Dorsey's confession." The majority applies the *Edwards* presumption of involuntariness and concludes that Mr. Dorsey's initiation is invalid. It is invalid because Mr. Dorsey did not "know[ ] from his earlier experience [in the interrogation room] that he need only demand counsel to bring the interrogation to a halt." That is, he was left with the apparent belief that the police would not honor his request for counsel. Thus, says the majority opinion, because the police continued to interrogate Mr. Dorsey in Stage 1 after he asked for a lawyer, and because the majority cannot say that " '[h]is change of heart is less likely attributable to "badgering" than it is to uncoerced deliberation on his part,' " his confession may not be used as substantive evidence in another trial (but only for impeachment purposes)—even though his waiver of counsel and his confession were voluntary (but not knowing or intelligent) acts. In essence, the majority opinion asserts that the police "w[ore] down [Mr. Dorsey's] resistance and ma[d]e him change his mind"; thus, his initiation of the conversation with Officer Crespo was the "delayed product" of police badgering. The majority opinion goes on to hold that the government failed to show that the initiation and waiver requirements of *Edwards* were satisfied in this case.

For five reasons, I believe that the majority's analysis is seriously flawed and produces a regrettable imbalance in the competing considerations that I set forth above. First, the majority opinion ignores *Shatzer's* caution against an unjustified expansion of the *Miranda* and *Edwards* prophylactic rules. As *Shatzer* put it, "[b]ecause *Edwards* is 'our rule, not a constitutional command,' 'it is our obligation to justify its expansion.' " *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045 (2010) (citation omitted). As I indicate below, I do not believe that the majority justifies the addition of yet another prophylactic rule. Second, and related to the first point, the majority opinion ignores *Montejo's* and *Shatzer's* emphasis on the need to assess the benefits and costs of a prophylactic rule. *Montejo v. Louisiana*, 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009), teaches that when a court "creates a prophylactic rule in order to protect a constitutional right, the relevant 'reasoning' is the weighing of the rule's benefits against its costs." *Id.* at 793, 129 S.Ct. 2079. Moreover, " '[t]he value of any prophylactic rule ... must be assessed not only on the basis of what is gained, but also on the basis of what is lost.' " *Id.* (citation omitted).

*Shatzer* reminds us that "[a] judicially crafted rule is 'justified only by reference to its prophylactic purpose,' and applies only where its benefits outweigh its costs." 130 S.Ct. at 1220 (citations omitted). Clearly, the "fundamental purpose" of the *Edwards* rule "is to preserv[e] the integrity of an accused's choice to communicate with police only through counsel, by prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Id.* (internal quotation marks and citations omitted). But, the benefits of the new prophylactic rule an-

nounced in the majority opinion must be "measured by the number of coerced confessions it suppresses that otherwise would have been admitted." *Id.* (citing *Montejo, supra,* 556 U.S. at 793, 129 S.Ct. 2079).

Here, the new rule provides, in essence, that a suspect's initiation of a conversation with police is presumptively invalid following impermissible interrogation, and the confession must be deemed the "delayed product" of "badgering" where it is "reasonably attributable to the post-invocation questioning" after the suspect has requested counsel.[1] The record shows that the trial court made a factual finding that Mr. Dorsey's confession was not coerced and the majority opinion holds that "the government met its burden of showing the voluntariness of [Mr.] Dorsey's waiver and confession." Thus, on this record the expansion of the *Edwards* rule affords no benefit from suppressing a coerced confession. Perhaps the benefits of the new rule are grounded in precluding impermissible interrogation during police interview sessions with a suspect that precede the suspect's subsequent initiation of contact with the police, but the rule would then punish all police officers for the misdeeds of some. We cannot overlook the fact, however, that the majority's expansion of the *Edwards* prophylactic rule on the record in this case substantially increases its costs, which is "the in-fact voluntary confessions it excludes from trial, and the voluntary confessions it deters law enforcement officers from even trying to obtain." *Shatzer, supra,* 130 S.Ct. at 1222. "Voluntary confes-

sions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Id.* (internal quotation marks and citations omitted).

Third, the majority inappropriately applies the *Edwards* presumption to the record in this case. "The rationale of *Edwards* is that once a suspect indicates that 'he is not capable of undergoing [custodial] questioning without advice of counsel,' 'any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Shatzer, supra,* 130 S.Ct. at 1219 (quoting *Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)). In an effort to establish that Mr. Dorsey's initiation of a conversation with the police—after he was taken out of the interrogation room, moved to a cell, and had an opportunity for sleep and reflection—was the "delayed product" of "badgering," the majority opinion includes twenty-five pages of detailed, dramatic reiteration of the Stage 1 interrogation that the government readily conceded violated *Miranda* and *Edwards.*

In my view, the majority opinion's theory that Mr. Dorsey's initiation of the conversation with police manifested the "inherently compelling pressures" of custodial interrogation and was not his "purely voluntary choice" is not substantiated by this

---

1. The majority opinion disclaims any new prophylactic rule or expansion of an existing prophylactic rule. Although characterized as a "clarif[ication] [of] the requirements for finding a valid initiation and waiver," what emerges from the majority opinion is a new or expanded prophylactic rule. Here, the trial court specifically found that Mr. Dorsey, not the police, initiated the stage 2 contact. However, the majority opinion declares that initiation by a seasoned veteran of the criminal justice system is presumptively invalid because, in the view of the appellate majority, the initiation resulted from Mr. Dorsey's delayed reaction to badgering (that is, his initiation is reasonably attributable to badgering), even though his subsequent (his first and only) confession was voluntary, and even though there is no factual record to support the majority's theory.

record. The trial court specifically found that because he has "at least ten convictions," Mr. Dorsey is not "a novice to the criminal justice system." Rather, he is "a seasoned veteran when it comes to these criminal proceedings, given the number of convictions he has." In short, he is not a vulnerable, first, second or third time suspect, nervous and inadequately prepared for intense interrogation that blatantly violates a suspect's fundamental rights. Indeed, Mr. Dorsey's own comments during his Stage 1 interrogation, which resulted in no confession, support the trial court's characterization of him as "a seasoned veteran" of the criminal justice system. When a police interrogator accused Mr. Dorsey of robbing an old woman, he responded: "I don't know what you are talking about here. . . . When you say I robbed somebody, just put me back there and we'll go to court. You know I'm used to that." When a photograph was taken of Mr. Dorsey during a pause in the interrogation, he stated: "He's trying everything in the book. I don't know what he's trying now." When the interrogators made statements about Mr. Dorsey's mother, he maintained, "I'm going to court." After the interrogators persisted with their theme about Mr. Dorsey's mother and church, he indicated that he wanted to sleep and that he "should [have] just got a lawyer." He also talked about going to court. After he confessed during the Stage 2 interview, Mr. Dorsey said to Officer Crespo: "I know y'all [did not have a] case on me. I could have probably gone to court and beat it anyway."

Fourth, as the majority opinion indicates, the new prophylactic rule it announces is not a *per se* rule; rather, it is one which necessitates a case-by-case factual inquiry. The rule thus has obvious potential for confusing, conflicting, and fact-intensive panel opinions based upon the subjective views of appellate judges as to whether the government failed to sustain its burden of proof to show that a suspect's initiation of conversation with the police "was not reasonably attributable to the post-invocation questioning." The danger spawned by the new judicially-created rule is that this appellate court will transform itself into a quasi-trial court, in these types of cases, as it sifts through and rehashes facts developed and considered in our trial court.

Fifth, the new prophylactic rule is founded upon a weak stone. *State v. Yoh,* 180 Vt. 317, 910 A.2d 853 (2006), is the only case cited by the majority in support of its standard that "the government must show that [initiation] was not reasonably attributable to the post-invocation questioning." Interestingly, *Yoh* did not result in the reversal of Mr. Yoh's conviction for the murder of his wife, because his actions in initiating conversation with the police and in confessing were voluntary. *Id.* at 863. The court stated: "If appellant had confessed in the second interview, our analysis would be quite different, but instead, he confessed in the third interview, after giving every indication that he understood his rights and was choosing not to exercise them." *Id.* The court did not apply *Edwards'* presumption of invalidity, even though one could see a direct connection between the impermissible interrogation in which the police made repeated references to Mr. Yoh's family, and his decision to confess. Before confessing, Mr. Yoh talked about his family, telling a Pennsylvania state trooper: " 'If you can keep those guys [meaning the state troopers] off my family, I will tell them everything they want to know.' " *Id.* at 858. In contrast, Mr. Dorsey did not parrot the Stage 1 interrogators' words when he confessed. He used his own words, saying that he did not know that the victim was "that old" and emphasizing that he had

"never [before] robbed a woman in [his] life." For those reasons, this seasoned veteran of the criminal justice system was remorseful and voluntarily confessed.

The sequel to the *Yoh* state case also is instructive, and again shows that the majority's new prophylactic rule is founded on a weak stone. Subsequent to the state decision in *Yoh*, Mr. Yoh sought federal habeas corpus relief. He challenged the trial court's failure to suppress his confession. He contended that "his confession is both *presumptively* invalid under the prophylactic rules of *Miranda* and its progeny, and *actually* involuntary under traditional notions of due process." *Yoh v. Pallito*, No. 1:09–CV–18, 2009 U.S. Dist. LEXIS 12167, at *15, (D.Vt. Nov. 4, 2009), *aff'd and adopted by* 2009 WL 5218070, at *1, 2009 U.S. Dist. LEXIS 121616, at *1 (D.Vt. Dec. 30, 2009). While recognizing "judicial concerns of police 'badgering'" and the fact that "claims of 'suspect initiation'" may "lack credibility in both substance and form," the federal court declared: "But it is an entirely different matter to extend the presumption over those cases in which the tainted interrogation comes to a definitive end, and, while outside the presence of his interrogators, the suspect changes his mind and decides to speak with the police once again." *Id.* at *20. Furthermore, the court declared that "the badgering justification carries far less weight in cases where the badgering ostensibly does not work, that is, when the police give up and end the interrogation having received neither a waiver nor a confession, and subsequent custodial statements come only at the suspect's request." *Id.* *31–32. Here, the police badgering in Stage 1 did not work, as Judge Thompson pointedly and clearly establishes. Rather, Mr. Dorsey skillfully deflected every police tactic designed to extract a confession from him; and he had time to sleep and reflect alone before initiating conversation with Officer Crespo and confessing.

In short, I believe that the majority's expanded and new prophylactic rule is unjustified on this record. It creates an unnecessary imbalance in competing considerations in Fifth and Sixth Amendment jurisprudence, considerations designed to protect the fundamental rights of suspects, their rights to voluntarily initiate contact with the police to confess, society's desire to curb impermissible interrogation, and the right of individual citizens and their communities to be free from and protected against heinous crimes. But, even assuming that the majority is correct and that *Dorsey* is an appropriate case for the announcement of an expanded and new prophylactic rule, Judge Thompson's cogent analysis shows that the government met its burden of proof under the standard articulated by the majority. Therefore, I respectfully dissent, and I also join Judge Thompson's dissent.

In re D.S., K.M., B.S., R.S., T.S. & P.S.; J.M., Appellant.